ZENITH RADIO CORPORATION

v.

MATSUSHITA ELECTRIC INDUSTRI-
AL CO., LTD. et al.

In re JAPANESE ELECTRONIC PROD-
UCTS ANTITRUST LITIGATION.

Civ. A. No. 74–2451.
MDL No. 189.

United States District Court,
E. D. Pennsylvania.

May 5, 1980.

As Amended May 27, 1980.

See also, D.C., 494 F.Supp. 1263, D.C.,
494 F.Supp. 1257.

Edwin P. Rome (argued), William H.
Roberts, John Hardin Young, Blank, Rome,
Comisky & McCauley, Philadelphia, Pa., for
plaintiff, Zenith Radio Corp.; Philip J. Cur-
tis, John Borst, Jr., Glenview, Ill., of coun-
sel.

Ira M. Millstein, A. Paul Victor, John F. Carney (argued), Joel B Harris, Kevin P. Hughes, Jeffrey L. Kessler, Alan Rothstein, Weil, Gotshal & Manges, New York City, Raymond T. Cullen, Philadelphia, Pa., Michael S. Kelly, Jeffrey W. King, Washington, D. C., Morgan, Lewis & Bockius, Philadelphia, Pa., for Matsushita defendants.

Metzger, Shadyac & Schwarz, Tanaka, Walders & Ritger, Washington, D. C., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Hitachi defendants.

Whitman & Ransom, New York City, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Sanyo defendants.

Wender, Murase & White, New York City, Dechert, Price & Rhoads, Philadelphia, Pa., for Sharp defendants.

Reid & Priest, New York City, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for Mitsubishi Corp. and Mitsubishi Intern. Corp.

Mudge, Rose, Guthrie & Alexander, New York City, Drinker, Biddle & Reath, Philadelphia, Pa., for defendants Toshiba Corp. and Toshiba America, Inc.

## OPINION AND ORDER

### (Indirect Injury—Illinois Brick)

EDWARD R. BECKER, District Judge.

## I. *PRELIMINARY STATEMENT*

This opinion addresses the motion for summary judgment brought by certain defendants[1] against plaintiff Zenith Radio Corporation (Zenith) on the grounds that Zenith could only have been indirectly injured by defendants' alleged violations of the antitrust laws, and that its ability to recover is therefore eradicated by the doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

The facts of this extensive litigation have been amply described elsewhere, and we need not elaborate them here.[2] In brief, Zenith is one of two plaintiffs[3] who have brought suit against virtually the entire Japanese consumer electronics product industry, alleging that the Japanese defendants[4] and their coconspirators are and have been participants in a massive unitary conspiracy which, by artificially lowering export prices, has for more than twenty years sought the methodical destruction of the United States domestic consumer electronics products industry. The defendants are accused of carrying out the aims of this conspiracy by flooding the American market with imported goods at prices so attractive to consumers that domestic producers suffered serious losses, and were either unable to compete or able to do so only by removing their own production facilities from this country. This conspiracy is alleged to violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 73 of the Wilson Tariff Act, 15 U.S.C. § 8. Plaintiffs also allege actual and attempted monopolization under § 2 of the Sherman Act; violation of § 801 of the Revenue Act of 1916, better known as the 1916 Antidumping Act,

---

1. The instant motion was filed by the Matsushita, Hitachi, Sanyo, Sharp, Mitsubishi Corp. and Mitsubishi International Corp. defendants. The Toshiba defendants later joined the motion.

2. *See* Opinion (Introduction to Summary Judgment Motions; Subject Matter Jurisdiction), 494 F.Supp. 1190 at 1195–1198 (April 14, 1980), which we hereby incorporate by reference.

3. As the defendants have moved for summary judgment on grounds of indirect injury against Zenith alone, National Union Electric Corporation (NUE), the other plaintiff in this consolidated litigation, is not involved in the instant motion.

4. The ten principal defendants are Mitsubishi Corporation, a Japanese trading company; Matsushita Electric Industrial Co., Ltd., Toshiba Corporation, Hitachi, Ltd., Sharp Corporation, Mitsubishi Electric Corporation ("MELCO"), Sanyo Electric Co., Ltd., and Sony Corporation, all Japanese manufacturers of consumer electric products; and two American companies, Motorola, Inc. and Sears, Roebuck & Co. Fourteen other defendants are subsidiaries of the principal Japanese defendants. Of the twenty-four defendants, fifteen are defendants in both suits, seven in the Zenith action only, and two in the NUE action only.

15 U.S.C. § 72;[5] price discrimination under the Robinson-Patman Act, 15 U.S.C. § 13(a); and, as to certain of the defendants, violations of § 7 of the Clayton Act, 15 U.S.C. § 18.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" and recover treble damages. In *Illinois Brick* the Supreme Court confined that treble damage recovery to those "*directly* injured" by the antitrust violation, rejecting the "pass-on" damage theory proffered by the plaintiff. Because Zenith concededly sells its consumer electronic products to independent wholesalers,[6] and not to retailers or ultimate consumers, defendants maintain that any injury which Zenith may have suffered by virtue of defendants' alleged antitrust violations must have been a result of lost sales or lower prices of Zenith's distributors. The distributors' injury would then have been passed back to Zenith in the form of reduced purchases or purchase prices. This passing on, it is asserted, evidences an injury which is solely derivative and indirect,

and as such not cognizable under the doctrine of *Illinois Brick* and the case whose rationale was thought by the Supreme Court inexorably to require the holding in *Illinois Brick*, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

Zenith rejoins by asserting that *Illinois Brick* must be restricted to its particular factual pattern, and that that case certainly did not overrule *sub silentio* ninety years of antitrust law and practice by which manufacturers have successfully maintained actions for violations of the antitrust laws by their manufacturing competitors. To grant defendants' motion, Zenith asserts, "would emasculate Section 4 of the Clayton Act and would seriously undermine its purpose as a bulwark in the Congressional scheme of enforcement of the federal antitrust laws." As will be seen in the discussion below, we agree with Zenith's contentions. However, since further elaboration of the parties' contentions will be intelligible only against the backdrop of a discussion of *Illinois Brick*, we turn now to an explication of that case.[7]

---

**5.** In our Opinion (1916 Antidumping Act), accompanied by Pretrial Order No. 237, both filed April 14, 1980, we granted summary judgment for the defendants with respect to virtually all of Zenith's dumping claims under the 1916 Act, and dismissed NUE's dumping claims *in toto*. In our opinion we certified the ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and the plaintiffs have petitioned the Court of Appeals for leave to appeal the ruling. No. 80–8072 (3d Cir., petition filed Apr. 24, 1980).

**6.** Zenith owns four of its wholesalers. The defendants concede that *Illinois Brick* would not bar Zenith from maintaining this action for any injury it might have suffered as a distributor of its own products. They point out, quite correctly, however, that Zenith has not sought to recover damages for injury to its business as a distributor of its own products.

**7.** We have described this motion as an Indirect Injury—*Illinois Brick* motion. Because, however, of the kinship between motions of indirect injury and motions of standing and antitrust injury in general, *see* discussion at p. 1253 *infra*, it is important at the outset that we define precisely what it is that this motion asks us to decide. It is clear that this case does not

present an issue of standing to sue under § 4. As pointed out by the Supreme Court:

> [T]he question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4.

*Illinois Brick*, 431 U.S. at 728, n. 7, 97 S.Ct. at 2065–2066. *Illinois Brick* does not purport to be a "standing" case as opposed to an "indirect injury" case, and the defendants do not assert lack of § 4 standing.

Less clear is whether we are asked to determine whether Zenith has suffered antitrust injury as defined by *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Although Zenith, in its memorandum, went to great lengths to show how it was injured, and although at times during oral argument it appeared that defendants were disputing the existence of any such injury, the questions has not been briefed or precisely advanced in those terms, and we deem this antitrust injury question not to be before us. Rather, we must determine whether Zenith's injury as alleged is indirect within the meaning of *Illinois Brick*, and if Zenith is barred from recovery for that reason.

## II. *ILLINOIS BRICK:* ITS HOLDING AND RATIONALE

■ In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), plaintiffs, purchasers of completed buildings, brought suit under § 4 of the Clayton Act alleging that defendants, concrete block manufacturers, had engaged in a price-fixing conspiracy in violation of § 1 of the Sherman Act. Defendants sold their concrete block primarily to masonry contractors, who in turn sold to general contractors who incorporated the block into the finished structures purchased by plaintiffs. Thus the only way plaintiffs could have been injured by defendants' price-fixing conspiracy would have been if the overcharge had been passed along throughout the chain of distribution, resulting in proportionately higher prices to plaintiffs, rather than being absorbed at other levels of the chain. Defendants contended that this offensive use of a pass-on theory by an indirect purchaser plaintiff was barred as being logically inconsistent with the previously adopted ban on the defensive use of a pass-on theory in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

In *Hanover Shoe*, which also dealt with an illegal overcharge, the defendant, a manufacturer of shoe machinery, had attempted to show that the plaintiff, a shoe manufacturer who utilized defendant's equipment, had not been injured because it had passed on the overcharge to those who bought its shoes—*i. e.,* that the shoe consumer was the only person actually injured by the antitrust violation. The Supreme Court rejected that defensive passing-on theory, holding that a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured by the full amount of the overcharge paid by him, and that evidence of actual injury to the indirect purchasers would not be permitted. 392 U.S. at 494, 88 S.Ct. at 2232.

The *Hanover Shoe* Court rooted its decision in two major policy concerns. First, it was disturbed by the specter of "long and complicated proceedings involving massive evidence and complicated theories" which would be necessary to establish the applicability of the pass-on defense. 392 U.S. at 493, 88 S.Ct. at 2231. To assert a pass-on defense, a defendant would be required to trace the effect of the overcharge on his purchaser's business, showing that the overcharge, and not some independent market variable, had determined his pricing policy in a manner which reflected the overcharge, and that the overcharge had not been absorbed and the price independently chosen. The Court felt that this task "would normally prove insurmountable," because the figures would be "virtually unascertainable," *id.*, but assumed that, if the defense were permitted, defendants would frequently assert it (and plaintiffs would have to rejoin), thus entangling the courts in unproductive protracted proceedings.

The *Hanover Shoe* Court's second concern was for the effectiveness of enforcement of the antitrust laws through the private treble-damage action. Under the defendant's theory, the ultimate consumer would be the only one ultimately able to bring suit, but that consumer might "have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws . . would retain the fruits of their illegality because no one was available who would bring suit against them." 392 U.S. at 494, 88 S.Ct. at 2232. Thus the overcharged direct purchaser was deemed by the Court to have suffered the full injury.

The parties before the Court in *Illinois Brick* agreed that whatever rule was ultimately chosen regarding the pass-on theory, it should apply symmetrically to plaintiffs and defendants.[8] The court was thus faced

---

8. The three dissenting members of the Court and the United States as amicus curiae adopted the opposite position: that the pass-on theory should be barred as a defense under *Hanover Shoe*, but that offensive use of the theory should have been permitted in *Illinois Brick*, 431 U.S. at 749, 97 S.Ct. at 2076 (Brennan, J., dissenting). The petitioner, the respondent, and the six-member majority of the Court agreed that whatever pass-on rule were adopt-

with two alternatives: to overrule (or restrict) *Hanover Shoe*, or to extend its rule to the offensive use of the pass-on theory. In terms of the facts of *Illinois Brick*, the latter course would require a holding that only the direct purchaser of the concrete blocks could sue, obviating the necessity of determining whether he had passed on the overcharge to others. In choosing this latter course, the Court echoed the concerns it had voiced in *Hanover Shoe*, discussing at some length the enormous difficulty of allocating the injury among the links of the distribution chain, and reemphasizing that the congressional policy of encouraging vigorous enforcement of the antitrust laws by private plaintiffs would be impeded by recognition of the pass-on theory. The *Illinois Brick* Court was also deeply concerned that recognition of the pass-on theory would raise the possibility of multiple recovery for the same antitrust injury by purchasers at different levels of distribution.

The *Illinois Brick* Court explicitly recognized two exceptions to its rule barring the assertion of pass-on theories, both offensively and defensively. The first exception, which had been formulated previously in *Hanover Shoe*, covers instances when the direct purchaser and the indirect purchaser are bound by a preexisting cost-plus contract. In such a situation, the Court noted, "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." 431 U.S. at 736, 97 S.Ct. at 2070. The second exception applies "where the direct purchaser is owned or controlled by its customer." *Id.* n. 16. Like the cost-plus exception, that situation is one in which "market forces have been superseded." *Id.* Since the policies underlying *Illinois Brick* and *Hanover Shoe*—principally the difficulty of proving that an overcharge

has been passed on, *see* 431 U.S. at 732 n. 12, 97 S.Ct. at 2067—would not be as seriously implicated in the cost-plus and control situations, the court carved out narrow exceptions for them.

Both *Hanover Shoe* and *Illinois Brick* arose in the context of a seller-purchaser relationship within a single chain of distribution, with allegations of an illegal overcharge. Thus, in that context, the Supreme Court has proscribed the use of the passing-on theory, both defensively and offensively. We are asked by defendants in the case at bar to read these cases broadly and apply their rule to preclude a manufacturer who sells his product through a wholesaler from recovering antitrust damages from an undercharging competitor who sells through a parallel distribution network, on the grounds that it is the wholesaler, and not the manufacturer, who is directly injured by defendants' undercharge. This we will decline to do, holding instead that the rule of *Illinois Brick* does not apply to this litigation.

### III. DISCUSSION

#### A. Introduction: The Parties' Contentions Refined

As we have seen, *Illinois Brick* holds that an antitrust plaintiff may not assert a pass-on theory of damages. Zenith, however, has not asserted a pass-on theory, relying instead on other methods of calculating damages. But, defendants argue, the only way Zenith can prove it was injured is by showing that the alleged injury directly inflicted on Zenith's distributors was passed on through their distribution chain, thereby damaging Zenith. Since Zenith has not even attempted to trace that injury through the chain, defendants argue that it is barred from recovery by *Illinois Brick*.[9] "The fact that the plaintiff may *in some colloquial sense* be a 'competitor' of the

---

ed should apply equally, offensively and defensively. *Id.* at 729, 97 S.Ct. at 2066.

**9.** We note that defendants' counterclaim presents the same potential *Illinois Brick* questions as does Zenith's complaint, *i. e.*, if defendants' indirect injury motion were to prevail, their marketing counterclaims, which are sub-

ject to the same attack as they have directed to plaintiffs' claims, would have to be dismissed at least to the extent that Zenith could prove that the counterclaimants sell to independent distributors and thus are not in direct competition with Zenith or its distributors.

defendant (although indirect)," [10] defendants urge, "does not call for a different result." (emphasis added).[11]

Zenith rejoins that there is no requirement anywhere in the ninety-year history of antitrust law that any injury, to be cognizable under the antitrust laws, must be traced through a seller's distribution network. Rather, it cites page after page of cases which have permitted recovery of antitrust damages by a manufacturer against a competing manufacturer without reference to the method of distribution. *See, e. g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). *See also Cromar Co. v. Nuclear Materials and Equipment Corp.*, 543 F.2d 501 (3d Cir. 1976). Thus, Zenith argues that *Illinois Brick* applies only in the restricted factual setting where an overcharge or an undercharge, *see In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979), is passed through a single chain of distribution, as it was in *Hanover Shoe* and *Illinois Brick*. Had the Supreme Court intended otherwise, Zenith contends, it would have at least hinted that it understood its *Illinois Brick* result to have such far reaching consequences.

The question before us then is the scope of *Illinois Brick*: was it intended to reach factual patterns like the one before us? Before addressing that question directly, we shall first discuss the cases which have construed *Illinois Brick*, for they will be helpful to that analysis.

## B. *Illinois Brick's Progeny*

■ The cases which have construed *Illinois Brick*, have, for the most part, refused to extend it beyond its confines. In *Dart Drug Corp. v. Corning Glass Works*, 480 F.Supp. 1091 (D.Md.1979), for example, the court held that *Illinois Brick* "bars suit only in those situations where plaintiff's injury is premised on an 'overcharge' and where, in order to prove that injury, plaintiff must also demonstrate that persons in the chain of distribution between plaintiff and the antitrust violator passed on the overcharge to plaintiff. Neither the speculative and complex nature of the proof nor the disincentive to sue resulting from the uncertain apportionment of a recovery exists where these two elements are lacking." *Id.* at 1101. In that case, the court examined the complaint claim by claim, dismissing only the price-fixing claim on *Illinois Brick* grounds. *See also Gas-a-Tron of Arizona v. American Oil Company*, 1977–2 Trade Cas. ¶ 61,789 (D.Ariz.1977), which similarly applied *Illinois Brick* selectively, allowing certain counts to remain.

**10.** Certain Defendants' Reply Memorandum in Support of Their Motions for Summary Judgment on the Grounds of Indirect Injury at 5–6. We think it somewhat disingenuous to refer to Zenith as a competitor of the Japanese defendants in a "colloquial sense." At best it "puts the rabbit in the hat."

**11.** The defendants' motion seeks dismissal of *all* counts of Zenith's Complaint and Counterclaim, including Zenith's claims under § 2 of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13, for price discrimination among domestic U.S. purchasers, and under the Antidumping Act of 1916, 15 U.S.C. § 72, for international price discrimination. In view of our disposition of the motion, we need not decide whether or not *Illinois Brick* requires the dismissal of particular counts of the Complaint and Counterclaim. However, we note that even if we were to agree with defendants' position that *Illinois Brick* mandates dismissal of Zenith's Sherman Act and Clayton Act § 7 claims, we might decline to extend

*Illinois Brick* to reach Zenith's claims under the Robinson-Patman Act and the 1916 Antidumping Act. We note in this regard that in *Julius Nasso Concrete Corp. v. DIC Concrete Corp.*, 467 F.Supp. 1016, 1020 n. 1 (S.D.N.Y.1979), Judge Robert L. Carter determined that *Illinois Brick* does not bar actions by indirect purchasers under §§ 2(a) and 2(f) of the Clayton Act as amended by the Robinson-Patman Act. We also note that, with respect to the 1916 Act, we might well hold that Congress plainly contemplated enforcement of the Act by means of civil suits brought by domestic manufacturers against foreign manufacturers, regardless of the nature of their distribution network. While we observed in our opinion of April 14, 1970, *supra* n. 5, at 37, that the standing provision of the 1916 Act tracks § 4 of the Clayton Act, defendants have conceded that the instant motion does not involve § 4 standing to sue. *See* n. 7, *supra*.

Similarly declining to broaden the scope of *Illinois Brick*, a number of courts have held that a vertical conspiracy between links of a distribution chain will take the case out of *Illinois Brick. See Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980), *reversing* 460 F.Supp. 1151 (N.D.Ill.1978); *Reiter v. Sonotone Corp.*, 486 F.Supp. 115 (D.Minn.1980); *Florida Power Corp. v. Granlund*, 78 F.R.D. 441 (M.D.Fla.1978). In *Reiter*, for example, the defendants, following remand from the U.S. Supreme Court on standing grounds, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), argued that the action was barred by *Illinois Brick* because the plaintiff, a retail purchaser of hearing aids, had bought hearing aids from retailers and not from the defendant hearing aid manufacturers. The plaintiff had alleged a vertical conspiracy between manufacturers and retailers to fix retail prices. The court reasoned that the plaintiff's injury was direct even though she bought her hearing aid from an intermediary link in the distribution chain, since she bought the product directly from a member of the alleged price-fixing conspiracy.[12]

In *In Re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979), the Fifth Circuit extended *Illinois Brick* slightly by applying its holding in reverse, prohibiting indirect sellers from recovering damages for the monopsonistic undercharges allegedly forced upon them by price-fixing indirect buyers. In that case, the plaintiffs were cattle breeders who alleged that supermarket chains with oligopsony power were able to set the prices at which they would buy beef. The plaintiffs were not allowed to recover against the defendant retail chains because the injury was passed through the intermediary meat packers. Thus *Illinois Brick* was held to apply when the antitrust

violation was at the retail level and the injured party was the original seller, two levels back in the distribution chain. It is readily apparent, however, that this situation was the simple mirror image of the facts in *Illinois Brick* itself, and involved a claim within a single distribution chain.[13]

In urging us to extend *Illinois Brick's* rule beyond injuries alleged to have been passed through a single distribution chain, defendants place their primary reliance on two cases. The first is *Parkview Markets Inc. v. The Kroger Co.*, 1978 Trade Cas. ¶ 62,373 (S.D.Ohio 1978), in which plaintiff was a wholesale grocery cooperative which sold groceries to its member retail stores, while the defendant was a consolidated wholesale-retail grocery enterprise. There were therefore, as in this case, two parallel lines of distribution: from Parkview to its member stores, and from Kroger's wholesale operation to its retail units. The alleged antitrust violations are not described in any detail in the opinion of the court, but are said to have "occurred only at the retail supermarket sales level." *Id.* at p. 76,205. The court held that the plaintiff lacked "standing" to bring an antitrust action for such violations, citing *Illinois Brick, supra, Gas-a-Tron, supra,* and the district court decision in *Beef Industry, supra.* We disagree that that result follows inexorably from *Illinois Brick.* While the *Parkview* opinion is totally lacking in analysis and is, at best, opaque, the court appears to be saying that *Parkview* was outside the target area of potential plaintiffs, *i. e.,* that its injury was so indirect as to deny it *standing* under § 4 of the Clayton Act. *See* n. 7, *supra.* To the extent that the opinion does purport to be grounded upon *Illinois Brick,* we decline to follow it.

---

12. The court also noted that a vertical conspiracy could also fall within the control exception to the *Illinois Brick* rule, see p. 1250, *supra.*

13. The Fifth Circuit also applied *Illinois Brick* to plaintiffs' claims against a trade publication and trade association which were not in the single chain of distribution. It did so, however, solely on the premise that the plaintiffs' claims against those defendants as coconspirators of

the supermarket defendants asserted the same pass-on theory which the court of appeals rejected when asserted against the supermarket defendants themselves. 600 F.2d at 1159–60. Ultimately, the Fifth Circuit held that the plaintiffs' pleadings stated a *cause of action within* the cost-plus exception to *Illinois Brick*, see p. 1250, *supra,* 600 F.2d at 1163–67.

Of considerably more value is *Mid-west Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979). One of the plaintiffs in that case, Murray's of Baederwood, was a direct purchaser of consumer bags from competitors of the defendants. Murray's maintained that it was directly injured because its seller was able to charge artificially inflated prices under the "umbrella" of defendant's pricefixing, even though that seller was not directly implicated in the pricefixing scheme. Writing for the court in an extremely thoughtful opinion, Judge Adams viewed the question as essentially one of standing, while looking for guidance to the related theories of antitrust injury and pass-on. These three theories, said Judge Adams,

> "each address different aspects of the problem of determining when a person is sufficiently 'injured in his business or property by reason of anything forbidden in the antitrust laws,' so as to be eligible to sue for treble damages. Together, they constitute the judicial gloss upon the words of § 4 by which the courts have patrolled the portals to a treble damage action."

596 F.2d at 582. No matter which inquiry is involved in a particular situation, he continued,

> "the line drawing that necessarily takes place is informed by an inquiry into what posture best effectuates the dual purposes of the treble damage remedy, namely, compensating victims of antitrust violations for their injuries and deterring violators by depriving them threefold of 'the fruits of their illegality,' while at the same time furthering the overriding goal of the antitrust laws—preserving competition."

*Id.* at 583 (footnotes omitted).

The Third Circuit, like the *Illinois Brick* Court, was also concerned about the possibility of duplicative recovery and the administrative difficulties of complex conjectural economic analysis. *Id.* The court viewed the issue as whether Murray's injury should be "legally attributable" to the defendants. Relying heavily on the policies behind the *Illinois Brick* decision, the court held that Murray's was too remote from the defendants to have standing to sue for treble damages resulting from its purchase from defendants' competitors. It observed that tracing Murray's injury to the defendants' violations would require the same kind of complex economic analysis as the pass-on theory rejected in *Illinois Brick* and *Hanover Shoe, id.* at 584; that "the objectives of the treble damage action" were adequately served by suits brought by direct purchasers from the defendants themselves, *id.* at 585–86; and that granting standing to purchasers like Murray's might "subject antitrust violators to potentially ruinous liabilities, well in excess of their illegally-earned profits," *id.* at 586–87.

While in *Mid-West*, like the present action, there were two parallel chains of distribution, we can discern no other factual similarities between *Mid-West* and the situation now before us. It may conceivably be argued from some of its language that *Mid-West* is a standing case, hence, inappropriate here. However, we perceive the principal teaching of *Mid-West* to be that the applicability of the *Illinois Brick* rule to fact patterns which diverge from the model of a single distribution chain should be determined by assessing, in each factual situation, the weight of the policies articulated by the Supreme Court in *Illinois Brick* and by the Third Circuit in *Mid-West*. As we shall now demonstrate, those policies do not support the defendants' contention that *Illinois Brick* should be extended to bar a manufacturer from suing competing manufacturers in the circumstances of this case.

C. *The Scope and Application of Illinois Brick*

█ Measuring the present motion against the three principal policy concerns articulated by the Supreme Court in *Illinois Brick* and by the U. S. Court of Appeals for the Third Circuit in *Mid-West Paper*, we readily conclude that defendants' motion is without merit.

The first concern of those courts was the difficulty of proving that an overcharge or undercharge had been passed on to another

level of distribution, or (as in *Mid-West*) to a parallel distribution chain under a price-fixing "umbrella." That concern is not germane here, for the plaintiff has never sought to prove injury by means of a pass-on theory. Instead, Zenith seeks to prove its damages by calculating its lost profits. It has offered four alternative methods of calculating lost profits: (1) by comparing the prices in the consumer electronics industry during the relevant time period with prices in a similar consumer durable industry; (2) by comparing Zenith's returns on sales revenue to the allegedly "normal" rate of return; (3) by comparing Zenith's rate of return on sales during the damage period with Zenith's rate of return before the defendants allegedly began to injure Zenith; and (4) by comparing Zenith's rate of return on stockholders' equity during the damage and pre-damage periods. Although at this juncture we intimate no view of the viability of any of these damage theories, the variety of ways that Zenith could calculate the damages renders the policies of *Illinois Brick* concerning the difficulty of proving injury by means of a pass-on theory inapplicable here.

While the damage calculation may be a complex one, as is often true in antitrust cases, the complexity here is not of the type which *Illinois Brick* and *Mid-West Paper* warned against. Zenith does not seek to trace the passing of an overcharge or undercharge through its distribution chain. Instead, it seeks to show that its profits would have been greater "but for" the alleged violations. If *Illinois Brick* bars this thoroughly conventional kind of damage calculation, it would deny recovery to nearly all antitrust plaintiffs. In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, the Supreme Court specifically approved such inferential damage calculations, following a long line of similar decisions:

> Trial and appellate courts alike must . . . observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely sus-

ceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs. *Bigelow v. RKO Pictures, Inc., supra*, 327 U.S. [251], at 264, 66 S.Ct. [574], at 579 [90 L.Ed. 652.] See also *Eastman Kodak Co. v. Southern Photo Materials Co. of New York*, 273 U.S. 359, 377–379, 47 S.Ct. 400, 404–405, 71 L.Ed. 684 (1927); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 561–566, 51 S.Ct. 248, 250–251, 75 L.Ed. 544 (1931).

395 U.S. 100, 123–25, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). In the absence of any clear indication that the *Illinois Brick* Court intended to overrule *Hazeltine* and the prior decisions cited therein, we lack the authority to extend *Illinois Brick* to bar all inferential proof of damages in an antitrust action, even were we inclined to do so.

The second concern of the *Illinois Brick* and *Mid-West* courts was that recognition of the pass-on theory would discourage treble-damage plaintiffs from "assum[ing] the mantle of private attorneys general," 596 F.2d at 585, by dispersing the possibility of recovery among a large number of indirectly-injured plaintiffs. As the Supreme Court explained:

> [W]e understand *Hanover Shoe* as resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it. . . .

*Illinois Brick*, 431 U.S. at 734–35, 97 S.Ct. at 2069. Furthermore, said the Court:

We think the longstanding policy of encouraging vigorous private enforcement of the antitrust laws, see, *e. g., Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968), supports our adherence to the *Hanover Shoe,* rule, under which direct purchasers are not only spared the burden of litigating the intricacies of pass-on but also are permitted to recover the full amount of the overcharge.

*Id.* at 745–46, 97 S.Ct. at 2074. The defendants here would have us disperse the possibility of recovery among a large number of allegedly directly-injured plaintiffs, *i. e.,* the Zenith distributors, who would not, either individually or collectively, be in a position to mount a litigation of the magnitude of this one.[14] *See* Opinion (Introduction to Summary Judgment Motions; Subject Matter Jurisdiction), 494 F.Supp. at 1195–1198 (1980) (magnitude of litigation). Obviously, this result would discourage private enforcement of the antitrust laws in flagrant disregard of the expressed concerns of the Supreme Court and the Third Circuit.

The third and final concern articulated by the *Illinois Brick* and *Mid-West* courts, and the one upon which defendants place the most weight, is the possibility of multiple recovery by plaintiffs at different levels of distribution, were we to decline to extend *Illinois Brick* to the facts of this case. The defendants argue that they face exposure not only to the instant action filed by a manufacturer who is "indirectly" injured, but also to possible actions filed by the distributors who, in their contention, are the directly injured parties.[15] This argument is based upon the assumption that damages which might be awarded to Zenith and to its distributors would constitute a duplicative recovery for the same antitrust injury, as multiple recovery of the overcharge in *Illinois Brick* or *Mid-West Paper* would have been. That assumption is inconsistent with the reasoning of the Third Circuit in *Mid-West Paper.*

When a purchaser is the victim of a monopoly overcharge, as in *Illinois Brick,* the injury sustained by the purchaser is equal to the benefit derived by the defendant, and both are equal to the amount of the monopoly overcharge. In that situation, if the seller could be held liable for damages in the amount of the overcharge both to the direct purchaser and to one or more indirect purchasers, it makes sense to speak of duplicative recovery, since the seller would be deprived more than once of his illicit gain, *i. e.,* the monopoly overcharge (leaving aside the trebling of damages). Moreover, two or more plaintiffs would recover for the same injury, *i. e.,* the monopoly overcharge that was passed from one plaintiff to another.

As the Third Circuit recognized:

A different problem [from *Illinois Brick*] is presented where prices are fixed below the competitive market price or where defendants engage in other forms of anticompetitive conduct, such as group boycotts, vertical restrictions, or monopolization, since defendants' benefits in those instances are not so readily ascertainable, and may not be sufficient to compensate "those individuals whose protection is the primary purpose of the antitrust laws." In such circumstances courts have awarded damages based upon the amount of injury suffered by the plaintiff rather than the benefits derived by the defendants. *See, e. g., Pitchford v. Pepi, supra,* 531 F.2d [92,] at 107–09 [(3d Cir. 1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976)].

*Mid-West Paper, supra,* 596 F.2d at 585 n. 47. The gravamen of Zenith's complaint is that the defendants conspired to fix prices of consumer electronics products sold in the

---

**14.** Although the burdens of mounting complex litigation might be eased if the Zenith distributors could maintain a class action under F.R. Civ.P. 23, defendants' counsel, in response to a question on this point, suggested at argument that the distributors could not maintain such an action.

**15.** To the extent that the actual probability of suit by the distributors is relevant, a point which we do not decide, it is worth noting that any suit filed by distributors in the future might well run afoul of the statute of limitations.

United States at a level below the competitive market price and to monopolize the United States markets for consumer electronic products. Thus Zenith's claims in this litigation fall squarely within the category of antitrust violations enumerated in the *Mid-West Paper* footnote which we have quoted. When plaintiffs seek to recover for injury inflicted by prices fixed below the competitive market price, the measure of damages cannot be the illicit gain appropriated by the defendants, since the defendants' allegedly illegal conduct would require them to *forego* present profits to achieve greater gain in the future. And, as the Third Circuit noted, the benefits derived by antitrust defendants from monopolization and other violations may not be "readily ascertainable." Therefore, in antitrust cases like the one presently before us, the measure of damages is "based upon the amount of injury suffered by the plaintiff rather than the benefits derived by the defendants." 596 F.2d at 585 n. 47.

As a result, it makes little sense to talk about multiple recovery for violations like those alleged here. If Zenith was injured by anticompetitive low prices, and its distributors were injured by the same prices, those are two injuries arising from the same cause. On the other hand, neither Zenith's injury nor its distributors' is equal to the benefit gained by the defendants from the violation, if indeed the defendants gained any benefit; yet it is that kind of symmetry of damage which is the touchstone of *Illinois Brick.*

Thus none of the policy concerns of *Illinois Brick* and *Mid-West Paper* are implicated in this litigation. The inapplicability of the *Illinois Brick* rule barring assertion of a pass-on theory of damages in this litigation between competing manufacturers is entirely consistent with the reasoning of the Supreme Court in its *Illinois Brick* opinion. It is plain from the face of the opinion that the Court viewed its decision in *Illinois Brick* as the mere logical corollary of *Hanover Shoe.* There is no indication in the *Illinois Brick* opinion that the Court intended to overturn ninety years of antitrust law, including established precedents like *Hazeltine, supra,* by barring competing manufacturers from presenting inferential proof of injury flowing from antitrust violations of their competitors. Indeed, the *Illinois Brick* court emphasized that "considerations of *stare decisis* weigh heavily in the area of statutory construction," creating a "presumption of adherence to [the Court's] prior decisions construing legislative enactments." 431 U.S. at 736, 97 S.Ct. at 2070. Surely if the *Illinois Brick* Court had intended to overrule its prior decisions permitting competitors to offer inferential proof of damages, it would have said so, or at least sent out much stronger signals.[16]

IV. *CONCLUSION*

*Illinois Brick* involved a single chain of distribution, as did its predecessor, *Hanover Shoe,* with an overcharge which was passed along that chain and with the injury to plaintiffs measured by the amount of the benefit (the overcharge) to the wrongdoer. In the absence of such a single distribution line, we read *Mid-West Paper, supra,* to instruct us to analyze the facts of the case before us in light of the policies which undergird the *Illinois Brick* pass-on doctrine, as well as those similar policies underlying the standing and antitrust injury doctrines. We have determined that the administrative difficulty of proving a pass-on defense, with its related problem of the potential for duplicative recovery, does not mandate, nor does the policy of continued vigorous enforcement of the antitrust laws countenance, dismissal of Zenith's claims in

16. While scholarly criticism of *Illinois Brick* and legislative attempts to overturn it do not undermine its authority as controlling precedent, if it were in fact controlling in this case, we note that the decision in *Illinois Brick* has drawn much criticism. It was contrary to the holdings of all but one of the courts of appeals to address the issue and contrary to the views of the vast majority of the commentators. *See Illinois Brick,* 431 U.S. at 753 n. 10, 97 S.Ct. at 2079 (Brennan, J., dissenting). The decision prompted an almost immediate legislative reaction, with bills to overrule it being introduced in two successive sessions of Congress. *See* Harris & Sullivan *Passing on the Monopoly Overcharge,* 128 U.Pa.L.Rev. 269 (1979).

this action. Rather, established precedents which permit Zenith to attempt to prove its alleged damages inferentially retain their vitality. Defendants' motion is therefore denied. An appropriate order follows.