In re MID–ATLANTIC TOYOTA
ANTITRUST LITIGATION.

No. MDL–456.

United States District Court,
D. Maryland.

June 30, 1981.

1288

Stephen H. Sachs, Atty. Gen. for the State of Md., Charles O. Monk, II, and Michael F. Brockmeyer, Asst. Attys. Gen., Baltimore, Md., for plaintiff State of Md.

Chauncey H. Browning, Atty. Gen. for the State of W.Va., and Charles G. Brown, Asst. Atty. Gen., Charleston, W.Va., for plaintiff State of W.Va.

Richard S. Gebelein, Atty. Gen. for the State of Del., and Edward F. Kafader, Asst. Atty. Gen., Wilmington, Del., for plaintiff State of Del.

Judith W. Rogers, Corp. Counsel, and Timothy J. Shearer, Asst. Corp. Counsel, Washington, D.C., for plaintiff District of Columbia.

Bernard D. Marcus and Linda H. Jones, Pittsburgh, Pa., for Daniel E. Golub.

Raymond W. Bergan, Scott B. Harris and William J. Murphy, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

These consolidated lawsuits consist, at present, of four (4) *parens patriae*[1] and three (3) individual[2] actions alleging certain violations of the federal antitrust laws, particularly price-fixing. The *parens* plaintiffs are seeking treble damages, declaratory and injunctive relief, costs and fees from the defendants on behalf of state residents who purchased Toyota automobiles bearing a protective finish and certain accessories jointly referred to for convenience as "polyglycoat." Plaintiffs allege, basically, that the defendants[3] conspired with one another to fix an artificially high price for this polyglycoat finish, in violation of § 1 of the

Sherman Act, 15 U.S.C. § 1.[4] The individual actions are similar to the *parens* cases in most material respects, although the *Golub* action additionally alleges an illegal tying arrangement and seeks money damages only.[5] Defendants MAT, Carecraft, and Weisman have moved to dismiss the *parens* actions insofar as they seek monetary relief, and the *Golub* action in its entirety, on the ground that they are brought by or on behalf of indirect purchasers barred from financial recovery under *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).[6] For reasons discussed at some length below, defendants' Motions will be denied at this time. However, defendants will be permitted to renew their Motions after discovery has been concluded if the facts, in light of the following remarks, so warrant.

### 1. The Illinois Brick Doctrine

While many lower courts have had occasion to discuss their views of the *Illinois Brick* doctrine[7] and its scope, this Court is compelled to reinvent the wheel so that the parties might reap some guidance from this Opinion as they prepare their future litiga-

---

**1.** *State of Maryland v. Mid-Atlantic Toyota, et al.*, Civil No. Y–80–3238; *State of West Virginia v. Mid-Atlantic Toyota, et al.*, Civil No. Y–81–726; *District of Columbia v. Mid-Atlantic Toyota, et al.*, Civil No. Y–81–805; *State of Delaware v. Mid-Atlantic Toyota, et al.*, Civil No. Y–81–650. For purposes of this Memorandum, the District of Columbia will be considered as if it were a State.

**2.** *Golub v. Mid-Atlantic Toyota, et al.*, Civil No. Y–81–806; *Johnson v. Mid-Atlantic Toyota, et al.*, Civil No. Y–81–913; *Johnston v. Mid-Atlantic Toyota, et al.*, Civil No. Y–81–1102.

**3.** The defendants are Mid-Atlantic Toyota Distributors, Inc. ["MAT"]; Carecraft Industries, Ltd. ["Carecraft"], a business which sells protective finishes to automobile dealers; Frederick R. Weisman ["Weisman"], an officer and director of both MAT and Carecraft; and the various Toyota dealerships which exist in the four States which bring these *parens* suits.

**4.** Treble damages are sought pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15.

**5.** The *Johnson* action likewise seeks monetary relief only; the *Johnston* suit requests both money damages and injunctive relief.

**6.** From time to time, the term "individual action" will be used in this Memorandum to signify the *Golub* lawsuit.

**7.** For discussions relevant to the instant matter see, e. g., *Jewish Hospital Association of Louisville, Kentucky, Inc. v. Stewart Mechanical Enterprises, Inc., et al.*, 628 F.2d 971 (6th Cir. 1980); *In Re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979); *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980); *Dart Drug Corp. v. Corning Glass Works*, 480 F.Supp. 1091 (D.Md.1979); *Reiter v. Sonotone Corp.*, 486 F.Supp. 115 (D.Minn.1980); *Gas-A-Tron of Arizona v. American Oil Co.*, 1977–2 Trade Cas. ¶ 61,789 (D.Ariz.1977); *Tech-nical Learning Collective, Inc. v. Daimler-Benz Aktiegesellschaft*, 1980–1 Trade Cas. ¶ 63,612 (D.Md.1980). For relevant law review articles, of which they are many, see Note, *Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation*, 63 Cornell L.Rev. 309 (1978); Beane, *Passing-on Revived: An Antitrust Dilemma*, 32 Baylor L.Rev. 347 (1980); Sneeden, *Illinois Brick—Do We Look To The Courts or Congress?*, 1979 Antitrust Bulletin 205.

tion strategies. The *Illinois Brick* rule, in its simplest form, bars damage actions against alleged price-fixers by indirect purchasers. It has its genesis in an earlier Supreme Court case, *Hanover Shoe, Inc. v. United States Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which held that an antitrust defendant could not defend a damage action on the ground that the plaintiff "passed-on" an illegal overcharge to its customers in the form of higher prices.[8] In *Hanover Shoe*, the plaintiff, a shoe manufacturer, sued defendant shoe machinery manufacturer on the theory that defendant's practice of leasing rather than selling the machinery violated § 2 of the Sherman Act, 15 U.S.C. § 2. This leasing practice allegedly resulted in costs higher than would have resulted had sales been permitted. The defendant sought to prove at trial that illegal overcharges, if any, had been passed on by the lessee-plaintiff to the plaintiff's customers, and that plaintiff consequently suffered no antitrust injury. The district court and the court of appeals were unimpressed by this argument, as was the Supreme Court which stated 392 U.S. at p. 489, 88 S.Ct. at p. 2229:

> [w]e think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he had made out a prima facie case of injury and damage within the meaning of § 4 [of the Clayton Act, 15 U.S.C. § 15].

The Court in rejecting the defensive use of passing-on emphasized the practical impossibility of tracing an overcharge through the distributive chain, 392 U.S. at 492–3, 88 S.Ct. at 2231, due to the subjective nature of pricing policies and the fluctuation of consumer demand. *See* Note, *Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation*, 63 Cor-

nell L.Rev. 309, 315 (1978). The Court was also concerned that private antitrust enforcement would be deterred if the defensive use of passing-on was approved, given that indirect purchasers suffer relatively insignificant monetary injury in relation to the direct purchaser and hence have a lesser incentive to litigate.[9] 392 U.S. at 494, 88 S.Ct. at 2232. The Court did recognize, however, that the ban on defensive passing-on was not necessarily an inflexible one:

> [w]e recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring the passing on defense not be permitted in this case would not be present.

*Id.* The result in *Hanover Shoe* thus appears to have been dictated by policy considerations; in circumstances where the policy concerns expressed in *Hanover Shoe* are not present, the defensive use of passing-on would not necessarily be proscribed. *In Re Beef Industry Antitrust Litigation, supra*, at 1157.

*Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), presented the Supreme Court with the flip-side of *Hanover Shoe*; offensive rather than defensive passing-on was the issue there. Plaintiffs, the State of Illinois and some 700 local governmental entities, brought suit against defendant concrete block manufacturers on account of alleged horizontal § 1 price-fixing violations. These manufacturers sold their price-fixed concrete blocks to masonry contractors, who used the blocks in structures which were in turn sold to general contractors and incorporated into buildings. The buildings were eventually purchased by the plaintiffs, who were thus at least two steps removed from the defend-

---

8. The doctrine of passing-on refers to the process whereby a member of the distributive chain who has been overcharged (or even undercharged) adjusts its prices to reflect that overcharge (or undercharge). *See In Re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1153 fn.2 (5th Cir. 1979).

9. Indeed, prior to *Illinois Brick*, it was arguable that the deterrence rationale was the primary impetus which gave rise to the *Hanover Shoe* decision. *Illinois Brick* made it clear that the difficulty-of-proof rationale was, in fact, predominant. *See In Re Beef Industry Antitrust Litigation, supra*, at 1156 fn.8.

ants in the distributive chain. Plaintiffs sought to recover from the defendants money damages in an amount equal to the overcharge exacted by the manufacturers and passed on through defendants' customers to the indirect purchasers themselves. The Supreme Court in *Illinois Brick* adopted a "unified mutuality" approach to passing-on problems, *In Re Beef Industry Antitrust Litigation, supra,* at 1157 and 1159 fn.13, by rejecting its offensive as well as defensive use. Whereas direct purchasers were entitled to sue the block manufacturers on the above facts, the Court explained,[10] indirect purchasers most certainly could not.

Like *Hanover Shoe,* the *Illinois Brick* opinion was grounded on policy considerations. The overriding consideration, of course, was symmetry. If a defendant manufacturer or supplier is not permitted to employ a passing-on defense, as *Hanover Shoe* held, an indirect purchaser plaintiff should not be permitted to recover passed-on damages from that constrained manufacturer or supplier. The Court eschewed adopting a symmetry approach purely for symmetry's sake; instead, it justified the need for symmetry on essentially two bases. First, permitting offensive but not defensive passing-on would subject a defendant to substantial risks of multiple liability. This point is nicely illustrated by the *Illinois Brick* facts. If the block manufacturers were not permitted to raise the passing-on defense in a suit brought by the masonry contractors, those contractors would be entitled to recover from the manufacturers the whole of the proven overcharge. If, too, the general contractors and/or the ultimate building purchasers were also permitted to recover damages for the passed-on overcharge, multiple recovery (even before trebling) would occur. In a typical manufacturer/retailer/customer triad, the overcharging seller could therefore be subjected to damages six times[11] that actually suffered by the direct purchaser and the ultimate consumer. Second, the identical tracing-of-damages difficulties identified in *Hanover Shoe* would occur in *Illinois Brick* as well:

> [t]he Court's concern in *Hanover Shoe* to avoid weighing down treble damages actions with the 'massive evidence and complicated theories,' 392 U.S. at 493, [88 S.Ct. at 2231], involved in attempting to establish a pass-on defense against a direct purchaser applies *a fortiori* to the attempt to trace the effect of the overcharge through each step in the distribution chain from the direct purchaser to the ultimate consumer. We are no more inclined than we were in *Hanover Shoe* to ignore the burdens that such an attempt would impose on the effective enforcement of the antitrust laws.

*Illinois Brick, supra,* 431 U.S. at 741, 97 S.Ct. at 2072. This unwavering resolve to remove damage calculation complexities from antitrust actions of this sort prompted the Court to state that indirect purchasers should not be permitted to sue under § 4 even if the risks of multiple liability could be avoided:

> even if ways could be found to bring all potential plaintiffs together in one huge action [thereby avoiding the possibility of inconsistent adjudication and multiple liability], the complexity thereby introduced into treble-damages proceedings argues strongly for retaining the *Hanover Shoe* rule.

*Id.* at 731 fn.11, 97 S.Ct. at 2067 fn.11. Thus, of the dual policy considerations arguing for the *Illinois Brick* doctrine, the tracing difficulties were the most persuasive.

The merits of the need for symmetry between *Illinois Brick* and *Hanover Shoe* can be argued *ad infinitum*; that, however,

---

10. In fact, the direct purchasers *did* sue the manufacturers in *Illinois Brick*, but their cases were settled. Sneeden, *Illinois Brick—Do We Look To The Courts Or Congress?*, 1979 Antitrust Bulletin 205, 209.

11. *See* Beane, *Passing-on Revived: An Antitrust Dilemma*, 32 Baylor L.Rev. 347, 353 (1980). This analysis assumes the unlikely fact that the indirect purchaser would be able to prove that the entire overcharge was passed on to it by the retailer-middleman.

is not the Court's function here.[12] What this Court is called upon to determine is whether the *Illinois Brick* rule is a blanket one, prohibiting all damage suits brought against defendants who are at least one step removed from the plaintiffs on the distributive chain, or whether it admits of exceptions. Further, if indeed *Illinois Brick* does admit of exceptions, do any apply in the instant case. It is to these inquiries that focus must now shift.

## II. *Exceptions To The Illinois Brick Rule*

■ As was the case in *Hanover Shoe*, the Supreme Court in *Illinois Brick* expressly noted that the newly-announced passing on rule was not absolute. Whereas in *Hanover Shoe* the Court recognized a single exception, for "cost-plus" contracts, the *Illinois Brick* Court saw fit to mention two. The first exception, again, was for "cost-plus" contracts. The *Illinois Brick* rule does not apply where an indirect purchaser buys a predetermined quantity of price-fixed goods from a direct purchaser operating under a "cost-plus" contract, as "[t]he pre-existing cost-plus contract makes easy the normally complicated task of demonstrating that the overcharge has not been absorbed by the direct purchaser." *Illinois Brick, supra*, at 732 fn.12, 97 S.Ct. at 2068 fn.12. This exception envisions that the direct purchaser, in setting the price at which to sell to the indirect purchaser, automatically adds a contractually predetermined sum to the price he paid the initial seller. The trier in these circumstances would not be burdened with the task of apportioning the middleman's mark-up between amounts attributable to an overcharge and amounts attributable to competitive forces. *See* Note, *Scaling the Illinois Brick Wall, supra*, at 329. Neither the *parens* nor the individual actions urge application of the "cost-plus" exception in the instant case; therefore, the precise mechanics of this exception need not be further explored.

■ The second exception expressly recognized by the *Illinois Brick* Court, in reality two exceptions rolled into one, arises "where the direct purchaser is owned or controlled by its customer." *Id.* 431 U.S. at 736 fn.16, 97 S.Ct. at 2070 fn.16. While the Court did not elaborate on "ownership or control" except to say that such circumstance presented "[a]nother situation in which market forces have been superceded...", *id.*, the unanimous view is that the exception applies not only where the direct purchaser is owned or controlled by its customer, but also where it is owned or controlled by its supplier. *In Re Beef Industry Antitrust Litigation, supra*, at 1160–1; *Jewish Hospital Association v. Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971, 974–5 (6th Cir. 1980); *Reiter v. Sonotone Corp., supra*, at 121 fn.6; *Dart Drug Corp. v. Corning Glass Works*, 480 F.Supp. 1091, 1104 (D.Md.1979); Note, *Scaling the Illinois Brick Wall, supra*, at 327 *et seq.* Plaintiffs once again have not urged application of the "ownership or control" exception to the present facts, obviating the need to further explore its parameters. The issue which this Court must decide is whether the above two exceptions are exclusive, as maintained by the defendants, or whether they are simply expository as the plaintiffs contend. Analysis of the policy considerations underlying *Illinois Brick* reveals quite clearly that the exceptions therein announced were not meant to be necessarily exclusive.

■ *Illinois Brick*, it has been shown, was premised throughout on policy considerations, principally the determination to avoid tracing complexities resulting from the passing-on of an overcharge through the various stages of the distributive chain. *Id.* 431 U.S. at 737, 97 S.Ct. at 2070 *et seq.* These tracing problems exist due to difficulties in attributing price increases, or any discrete portion thereof, to the illegal overcharge as opposed to the interaction of sup-

---

12. Mr. Justice Brennan in his dissent argued that the need for symmetry was superficial at best, as the "interests at stake" in offensive and defensive passing-on situations are in fact quite different. Offensive passing-on promotes compensation; defensive promotes escape from liability. A recent district court decision has expressed some agreement with the Brennan rationale. *Reiter v. Sonotone Corp.*, 486 F.Supp. 115, 118 fn.1 (D.Minn.1980).

ply and demand or other pricing factors— what the Supreme Court in footnote 16 referred to as "market forces."[13] The fact that the Supreme Court expressly grounded its recognition of the "ownership or control" exception on the observation that "market forces have been superceded," however, plainly indicates that other circumstances in which supercession of market forces has occurred could similarly fall outside the *Illinois Brick* rationale. This conclusion is fully consistent with *Illinois Brick*'s aversion to tracing. Where market forces have been suspended, tracing problems disappear; the whole of the overcharge can be said to have "passed through" to the ultimate consumer. Take away the principal policy consideration, the foundation so to speak, underlying *Illinois Brick*, and the reasons for applying the rule disappear. And when the reasons for the rule do not apply, application of the rule would be plainly inappropriate.[14] *Accord Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.*, 494 F.Supp. 1246 (E.D. Pa.1980).

The tracing problem, of course, was not the sole policy consideration underlying the *Illinois Brick* doctrine, though it was indeed the primary one. The rule was also viewed as necessary in order to prevent duplicative recoveries. At least one Court has held that the merest possibility of duplicative liability is enough to mandate dismissal of an ultimate consumer action under *Illinois Brick, Technical Learning Collective, Inc. v. Daimler-Benz Aktiegesellschaft*, 1980–81 Trade Cas. ¶ 63,612 (D.Md.1980) at 77, 254, apparently even if tracing problems are non-existent. Chief Judge Northrop, in *Technical Learning*, found support for his conclusion in footnote 11 of the *Illinois Brick* Opinion. This Court, however, reads footnote 11 as compelling no such blanket rule. It is certainly correct to note that footnote 11, and *Illinois Brick* in general, expresses concern for the duplicative liability risk. The precise context of that concern, naturally enough, was with regard to fact situations comparable to that presented in *Illinois Brick* where both the direct purchasers and the indirect purchasers had brought legal action against the manufacturer, and where the direct purchasers has already recovered "by obtaining a judgment or by settling, as is more likely (and as occurred here . . .)". *Illinois Brick, supra,* at fn.11. It was with respect to this circumstance that the Court found the risk of duplicative recovery, of "a little slopover," unacceptable. The Court was not dealing in *Illinois Brick* with just any circumstance where a creative mind could envision the merest possibility of duplicative recovery. Further on in footnote 11 the Court suggests that dismissal of ultimate consumer actions would be warranted even if the risks of duplicative liability could be avoided by bringing all potential plaintiffs together in one huge action, due to the "complexity" thereby introduced into treble-damage proceedings. As suggested earlier in this Opinion, such a statement appears merely to reemphasize the primacy which the tracing difficulties played in the Supreme Court's *Illinois Brick* holding. Nothing in footnote 11 mandates the conclusion that dismissal is required in *any* action

---

**13.** The commentators have suggested that passed-on overcharges could be calculated through use of the economic analysis commonly applies to excise taxes. Posner, *Economic Analysis of Law*, 509–514 (1977); Schaefer, *Passing-On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis*, 16 Wm. & Mary L.Rev. 883, 887–97 (1975). However, it has been suggested that "it is difficult, if not impossible, to determine with reasonable certainty the facts needed to apply this analysis." Note, *Scaling The Illinois Brick Wall, supra*, at 312. Further, the Supreme Court in *Illinois Brick* expressly rejected the use of economic models to calculate passed-on damages.

**14.** This Court further believes it highly unlikely that the *Illinois Brick* Court would have attempted to list in the text of the Opinion each and every circumstance where an exception to the rule would be warranted. Such a listing, in no way compelled by the *Illinois Brick* facts, would have been an inefficient exercise of judicial effort and, of course, *dicta*. Rather, this Court believes that the Supreme Court in *Illinois Brick* listed exceptions as a guide to the lower courts in determining the *types* of circumstances where application of the rule would not be required.

where the merest possibility of duplicative recovery can be seen to exist.

■ Footnote 16, in fact, implicitly rejects the conclusion that *Illinois Brick* mandates dismissal when only a mere possibility of multiple liability is shown. Footnote 16 recognizes the "ownership or control" exception to the rule against indirect purchaser suits. Focusing on the "control" aspect of this exception, the Court indicates that an indirect purchaser could sue a supplier for money damages on account of price-fixing if the supplier controlled the direct purchaser. The danger arguing for this exception is that, without it, the supplier would exercise its control to prevent a direct purchaser suit and at the same time hide behind *Illinois Brick* to prevent recovery from the indirect purchaser as well. In every situation in which the control exception can be invoked, however, there exists at least the "mere possibility" that the "controlled" direct purchaser will eventually bring a price-fixing suit against the supplier. While commencement of such a direct purchaser suit during the pendency of an indirect purchaser action conceivably could indicate a lack of "control," and hence could result in dismissal of the indirect purchaser suit,[15] dismissal would not necessarily result where the direct purchaser action was commenced after the indirect purchaser had already recovered money damages. Indeed, the supplier could not defend that later direct purchaser suit on a passing-on theory in light of *Hanover Shoe.* Nor would an *in pari delicto* defense be available, even if the direct purchaser was a co-conspirator. *See, e. g., Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Accordingly, the Court in *Illinois Brick* expressly recognized an exception to the indirect suit bar which by its very nature recognizes at least the "mere possibility" of duplicative liability. The *Technical Learning* contrary conclusion thus appears unjustified.

■ This analysis still leaves unresolved the precise role of the duplicative recovery policy factor when carving out exceptions to *Illinois Brick.* Duplicative recovery was undoubtedly a significant, although not the principal, concern of the *Illinois Brick* Court. *Id.* 431 U.S. at 737, 97 S.Ct. at 2070 *et seq.* This Court is certainly not prepared to state that indirect purchaser suits should be permitted whenever tracing problems do not exist, regardless of the risks of multiple liability. Such a pronouncement would plainly contradict the Supreme Court's manifest intent. Just as plain, though, is the conclusion that indirect purchaser lawsuits should be permitted wherever tracing problems are nonexistent and where only a "mere possibility" of duplicative liability is present. As will be shown below, this Court need not go beyond these conclusions on the instant facts, and accordingly will not do so. It suffices, at this point, to reiterate the observation that *Illinois Brick* does admit of exceptions beyond those expressly recognized in the text, in circumstances where application of the rule would further neither of the policy objectives underlying the doctrine itself. Yet to be considered is the issue whether the present allegations of the plaintiffs, if true,[16] establish such an exception.

### III. *The Proposed Illinois Brick Exception*

The *parens* plaintiffs have alleged a voluntary price fixing conspiracy between, *inter alia,* the regional Toyota distributor (MAT) and the various Toyota dealers. Each of these alleged conspirators has been named as a party defendant. The principal factual contention alleged by the *parens* plaintiffs is that the defendants fixed the *retail price* of Toyota's in order to recover unlawful proceeds from the individual automobile purchaser directly. The individuals represented in the *parens* actions, under this reasoning, purchased automobiles directly from a member of the price-fixing conspiracy. In this situation, plaintiffs argue, the policy factors underlying *Illinois*

---

**15.** *See* Note, *Scaling the Illinois Brick Wall, supra,* at pp. 328–9.

**16.** The allegations will be treated as true for purposes of these Motions to Dismiss.

*Brick* are not implicated, and the automobile purchasers should be allowed to sue each and every price fixer, MAT included.

The Court agrees. A number of courts, on similar averments,[17] have recognized at least the possibility of a "vertical conspiracy" or a "co-conspiracy" exception to the *Illinois Brick* rule.[18] Some courts have justified the finding of such an exception on the theory that the ultimate consumer is, under the circumstances of a conspiracy such as that alleged here, a direct rather than an indirect purchaser. *See Reiter v. Sonotone Corp., supra.* Others have concluded that there is no passed-through overcharge. *See Gas-A-Tron of Arizona v. American Oil Co.*, 1977–2 Trade Cas. ¶ 61,-789 (D.Ariz.1977) at 73,244. This Court does not consider it fruitful to undertake an overly semantic analysis of the co-conspiracy exception; what is useful instead is to review the allegations in light of the policy objectives underlying *Illinois Brick*. If those policy considerations argue for application of the *Illinois Brick* rule it will be applied, if they do not, it will not. A review of the instant pleadings from this perspective reveals that the *Illinois Brick* policy factors have no application here.

The principal of these policy factors, avoidance of tracing complexities, is inapposite when a dealer/distributor co-conspiracy is alleged. The injury suffered by the automobile purchasers through the effectuation of a voluntary co-conspiracy such as this can be determined by computing the retail price of a Toyota automobile but-for the alleged price fix, and subtracting that total from the actual purchase price. No other damage calculation would appear to be necessary on these allegations and no apportionment of passed-through overcharges is required. While such a calculation would appear to be a simple one, even if it is complex it would not be the type of complexity that the *Illinois Brick* Court was concerned with. *Zenith Radio Corp. v. Matsushita Electric Industrial Co., supra*, at 1254. If such a co-conspiracy in fact existed, market forces were superceded when the retail price was established; by definition, the retail price was not arrived at through the interaction of supply and demand. The first of the two *Illinois Brick* factors thus bears no relevance to circumstances involving a conspiracy among actors occupying different levels of the distributive chain, and consequently argues for prosecution of an ultimate consumer suit.

The second factor, risk of duplicative liability, likewise weighs in favor of permitting the *parens* suits to continue at this time. In *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Supreme Court refused to permit an antitrust defendant to raise an *in pari delicto* defense in a suit brought by plaintiff co-conspirator, on the grounds that the plaintiff had been compelled by the defendant to participate in the original conspiracy. *Perma Life* does not, however, stand for the proposition that the doctrine of *in pari delicto* is never to be recognized as a defense to an antitrust action. Indeed, five members of the *Perma Life* Court emphasized their belief that some aspects of the *in pari delicto* doctrine should be retained under the antitrust laws. As has been carefully reviewed by the Fifth Circuit in *Abraham Construction Corp. v. Texas Industries, Inc.*, 604 F.2d 897, 902 (5th Cir. 1979), those five members consisted of Justices White (plaintiff co-conspirator barred from suing defendant where both parties bear "substantially equal responsibility" for injury); Fortas (plaintiff barred where "the fault of the parties is

---

17. *See* footnote 6, *supra*.

18. Invoking the "rose by any other name" rule, the *parens* plaintiffs liberally cite the "vertical conspiracy" case law but refuse to bite the bullet and label the instant distributor/dealer conspiracy a vertical one. For purposes of this Opinion, the Court will identify plaintiffs' proposed exception as the "co-conspirator" rather

than the "vertical" exception, in that the correct definition of the alleged conspiracy has not been fully briefed by the parties. However, it is clear that in order to recover under this exception, the plaintiffs must prove the existence of a voluntary conspiracy between actors on both levels of the distributive chain. *See infra.*

reasonably within the same scale"); Marshall (plaintiff barred from suing where he "actively participated in the formation and implementation of an illegal scheme"); Harlan and Stewart (plaintiff suit barred when law was violated "in cooperation with defendant"). The Fourth Circuit in *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 16 (4th Cir. 1971), recognized this similarity of thought in announcing that:

> a party, who voluntarily formulates and equally participates in a non-coercive agreement for reciprocal dealing . . . , cannot maintain an action under § 1 of the Sherman Act against its trading partner.

The *parens* plaintiffs, we have seen, allege that the dealer defendants were voluntary and equal partners in the price-fixing conspiracy. If these allegations are true, as this Court must assume them to be at this time, the risk of duplicative liability is negligible in that the dealer defendants would be foreclosed from recovery under *Columbia Nitrogen* if they brought suit against the defendant distributor.[19] Accordingly, on the present facts, this second *Illinois Brick* policy factor militates against dismissal of the *parens* suits as well.[20]

■ With respect to the *Golub* plaintiff, however, a somewhat different conclusion is warranted. Unlike the *parens* plaintiffs, Golub has not in his lawsuit named the individual Toyota dealers as parties defendants. Given this circumstance the *Columbia Nitrogen in pari delicto* doctrine would *not* seem to apply:

> [w]hatever the merits of the arguments for [a vertical conspiracy exception to *Illinois Brick*] in general, we do not think that the reasoning of *Illinois Brick* permits recognizing the exception when . . . the alleged co-conspirator middlemen are not named as parties defendants. Absent

joinder of the [middlemen], the rule forbidding one antitrust conspirator from maintaining an action against another for damages arising from the joint activity would not protect these defendants from the risk of overlapping liability. The [defendants here] could not, in a suit brought by the [middlemen], use a judgment or finding of vertical conspiracy in the instant case to prevent the [middlemen] from successfully asserting in their own suit that they did not in fact conspire with the [defendants here] and are therefore not barred by the co-conspirator doctrine from recovering damages from the [defendants].

*Dart Drug Corp. v. Corning Glass Works*, 480 F.Supp. 1091, 1103 (D.Md.1979), *quoting In Re Beef Industry Antitrust Litigation, supra,* at 1163 (Opinion by Wisdom, J.). The risk of multiple liability facing the distributor defendants would thus appear to be a significant one, indeed, if plaintiff ultimately proves the existence of a conspiracy, almost an inevitable one. To permit such exposure would plainly run afoul of the manifest intent of *Illinois Brick* and cannot be justified. However, plaintiff will be permitted to amend his Complaint to add the Toyota dealers as parties defendants, as per his request. *See* Memorandum In Opposition to Motion to Dismiss at p. 10, fn.6.

For these reasons, defendants' Motions to Dismiss will be denied at this time. The Court recognizes, of course, that the plaintiffs have a long and tortuous road ahead in seeking to prove the existence of the voluntary conspiracy which they allege. The Court further recognizes that discovery, once completed, might reveal that the distributor and dealers did *not* combine or conspire in restraint of trade. For these reasons, the Court will permit any or all of the defendants to renew their *Illinois Brick*

---

**19.** While the *Columbia Nitrogen* court did express the view that the five *Perma Life* Justices discussing the general applicability of the *in pari delicto* defense suggested that the doctrine apply in antitrust cases "when parties of *substantially equal economic strength* " participate in a conspiracy, that conclusion does not appear to have limited the Fourth Circuit's rule

quoted above. Further, the *Perma Life* Opinions do not, to this Court, appear to mandate such a limitation. *See Abraham Construction Corp., supra,* at 902.

**20.** The Court notes for the record that none of the dealer defendants has brought suit against the distributor defendant at the present time.

Motions at a later time when the Court will be presented with additional facts from which an informed judgment can be made.

SO ORDERED.