## In re MICROSOFT CORP. ANTITRUST LITIGATION

Gravity, Inc., et al.,

v.

Microsoft Corp.

No. MDL 1332.

United States District Court,
D. Maryland.

Jan. 12, 2001.

Daryl Andrew Libow, Sullivan & Cromwell, Washington, DC, for Microsoft Corp.

William D. Coston, Venable, Baetjer & Howard, Washington, DC, for Compaq Computer Corp.

W. Stephen Smith, Morrison & Foerster, Washington, DC, for Dell Computer.

## OPINION

MOTZ, District Judge.

This case is one of the sixty-four antitrust actions against Microsoft Corporation that have been consolidated by the Multi–District Litigation Panel. It is different from all of the others in that it names as defendants, in addition to Microsoft, three original equipment manufacturers ("OEMs"), Compaq Computer Corporation, Dell Computer Corporation, and PB Electronics, Inc. (formerly Packard Bell NEC). Plaintiffs, Gravity, Inc., and Mark H. Dickson, allege that the four defendants conspired with one another to restrain trade unreasonably and to maintain Microsoft's monopolies in various markets.[1]

Plaintiffs seek to represent two classes. One of the classes is composed of U.S. purchasers, between October 20, 1993, and the present, of Microsoft Windows or MS–DOS operating software installed and sold with personal computers compatible with Intel x86/Pentium architecture, purchased directly from one of the three OEM defendants. The other class consists of U.S. purchasers, between October 20, 1993, and the present, of Microsoft word processing software and/or Microsoft spreadsheet software installed and sold with personal computers compatible with Intel x86/Pentium architecture, purchased directly from one of the three OEM defendants. Gravity also asserts an individual claim against Microsoft alone for monopolization of case management and litigation support software.

Defendants have moved to dismiss all of the claims. The motion will be granted except for the individual claim asserted against Microsoft by Gravity.

## I.

Plaintiffs' allegations against Microsoft in the class action claims are essentially the same as those made by the plaintiffs in the other MDL cases. Those allegations are summarized in Part I(A) of the companion opinion I am issuing today ("*MDL Microsoft I*"). I will not repeat them here. The additional allegations pertain to the asserted conspiratorial conduct of the three OEM defendants. According to plaintiffs, this conduct consisted primarily of those defendants entering into a variety of restrictive agreements with Microsoft, including per-processor licensing fees, long-term distribution contracts, the bundling of Microsoft operating system software with Internet Explorer to exclude browser and Java competition, and the bundling of Microsoft operating system software and application software.[2] (First Amended Complaint ("FAC") ¶ 61.) In addition, Microsoft and the three OEM defendants allegedly agreed not to alter the Windows 95 boot-up sequence, thereby giving Microsoft an unfair advantage over competing browser suppliers. (FAC ¶ 90.) The overall purpose and effect of the restrictive agreements between Microsoft and the OEM defendants is alleged to be the preservation of Microsoft's monopolies in the operating system software market and in the word processing and spreadsheet software markets. As a result, plaintiffs are alleged to have suffered inju-

---

**1.** To the extent one believes that the worth of an idea can be measured in part by the consistency with which it is advocated, it may be noted that plaintiffs' counsel in this action have not pursued their conspiracy theory in a case they have filed on behalf of other plaintiffs under the California antitrust statute, which forecloses any *Illinois Brick* defense. *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

**2.** Plaintiffs allege that the OEM defendants and Microsoft entered into exclusive dealing distribution arrangements and employed other unspecified "practices to exclude horizontal competition for Microsoft's" operating system software. (FAC ¶¶ 61–62.) However, these arrangements and practices are entirely unspecified, and plaintiffs' conclusory averments are not supported by any underlying factual assertions.

ry by defendants' raising the prices plaintiffs have paid for Microsoft's operating system and application software above competitive levels and by defendants' "denying them competitive choice, including the benefits of software innovation." (FAC ¶ 58.)

The specific benefits that plaintiffs allege the OEM defendants received from conspiring unlawfully with Microsoft are: "(a) inducements offered by Microsoft to enter into anticompetitive agreements; (b) the co-conspirators' capacity to charge mark-ups on monopoly software prices secure in the knowledge they would not be undercut by rivals; (c) the co-conspirators' capacity to compel their customers to purchase operating and application software secure in the knowledge they would not be undercut by rivals; and (d) the co-conspirators' capacity to compel their customers to purchase more memory and other hardware than would be necessary or desirable under full and vigorous software competition." (FAC ¶ 3.)

## II.

■ In the First Amended Complaint, plaintiffs allege two conspiracies, one in violation of section 1, and the other in violation of section 2, of the Sherman Act. 15 U.S.C. §§ 1 & 2. However, as accurately noted by plaintiffs' counsel during oral argument, the two conspiracies "coalesce," because the alleged conspirators are accused of having only one goal, the perpetuation of Microsoft's monopolies. Thus, this is a case in which the alleged section 1 and section 2 conspiracies are entirely coterminous with one another. With the possible exception of the per-processor licensing fees and long-term distribution contracts that expired near the beginning of the class period, plaintiffs allege no actual or intended restraint of trade short of monopolization.[3]

■ Accordingly, the sufficiency of plaintiffs' allegations must be gauged by the elements of a section 2 claim. Otherwise, plaintiffs could circumvent the requirements of a conspiracy to monopolize claim, including the requirement that a defendant be shown to have acted with the specific intent to monopolize, simply by characterizing their claim as one arising under section 1, whose elements of proof are not as stringent.[4] Plaintiffs do not

3. Defendants contend that any claims based upon the per-processor licensing fees and long-term distribution contracts would be barred by limitations. I need not decide that question since it is clear that those contracts terminated well before the end of the class period and thus could not themselves support the class claims that by their nature require conduct continuing throughout the class period.

4. Of course, in most cases (where plaintiffs allege a restraint of trade that may or may not be sufficiently effective to threaten or result in monopolization), section 1 and section 2 conspiracy claims can be separately pursued without plaintiffs being required to plead and prove section 2 elements as part of their section 1 claims. The "threshold showing" in such cases for both the section 1 and section 2 claims are the same. See, e.g., Weit v. Cont'l Ill. Nat'l Bank & Trust Co., 641 F.2d 457, 458 (7th Cir.1981) (addressing conspiracy charges pursued under both sections); see also United States v. Griffith, 334 U.S. 100, 106, 68 S.Ct. 941, 92 L.Ed. 1236 (1948) (exploring the relationship between section 1 and section 2 claims), overruled on other grounds, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 763 n. 8, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); cf. Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1573 (11th Cir. 1991) (noting common "threshold showing" required by the two sections); Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1460 n. 35 (11th Cir.1991) (same); Wagner v. Magellan Health Servs. Inc., 121 F.Supp.2d 673, 679 & n. 1 (N.D.Ill.2000) (same). However, since the section 2 claim has a higher intent requirement than does the section 1 claim, plaintiffs might prevail on the latter claim while losing on the former. Wagner, 121 F.Supp.2d at 681 ("A conspiracy to monopolize under Section 2 is somewhat different from its Section 1 counterpart because of its heightened intent element."). In the present case, that is not so, given the nature of plaintiffs' allegations and the admittedly fierce competition in the market in which the OEM defendants compete. The section 1 and section 2 claims necessarily rise and fall together since the only unlawful intent alleged is the intent to preserve Microsoft's monopolies.

**Page 731**

seriously argue to the contrary. They contend, however, that since the issue of intent ultimately presents a question of fact, the specific intent element of their conspiracy claims cannot be challenged until summary judgment, when an evidentiary record has been established. I do not agree. In a case such as this, a plaintiff's "factual allegations must be specific enough to justify 'drag[ging] a defendant past the pleading threshold' .... The price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir.1999) (citation omitted) (emphasis added); *Kramer v. Pollock–Krasner Found.*, 890 F.Supp. 250, 255–56 (S.D.N.Y.1995).

In the context of this case, what does "specific intent" mean? It signifies something more than willing, voluntary, and knowing participation in the illegal course of conduct that Microsoft is alleged to have pursued. It means participating in that course of conduct for the specific, shared purpose of maintaining Microsoft's monopolies. *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1283 (8th Cir.1981); *see also Northeastern Tel. Co. v. AT & T Co.*, 651 F.2d 76, 85 (2d Cir.1981) ("The essence of [conspiracy to monopolize] is an agreement entered into with the specific intent of achieving monopoly ...."). Thus, it is not enough to establish a section 2 conspiracy that the OEM defendants, confronted with demands made upon them by Microsoft by virtue of its monopoly power, decided to accede to those demands in order to gain advantage over their rivals in the markets in which they competed. Rather, what plaintiffs must prove is that when confronted with Microsoft's demands, the OEM defendants stepped back and concluded that maintaining Microsoft's monopolies was a goal that they themselves desired to accomplish. That is an element of plaintiffs' case, and they are under an obligation to plead facts from which it can reasonably be inferred that the OEM defendants formulated that intent.

Defendants argue not only that plaintiffs have failed to meet that obligation, but also that the conspiracy they charge is inherently implausible. It would be irrational, defendants contend, for them, as purchasers, to seek to maintain monopolies that Microsoft, their supplier, possessed. *See TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026–27 (10th Cir.1992); *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 994 (4th Cir.1990) ("[A]ppellants have articulated no motive the [defendants] might have to engage in such a conspiracy. Indeed, logically the converse is true because the [defendants] benefit when [suppliers] aggressively compete for contracts."); *Coastal Transfer Co. v. Toyota Motor Sales*, 833 F.2d 208, 211 (9th Cir.1987) ("[S]uch an intention ... would have been illogical because a restriction on competition in the [given] market would have raised prices in a market in which [the defendant] purchased services."); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109–10 (7th Cir.1984) ("[T]he plaintiffs are alleging, in essence, that [the defendant] conspired to injure itself."). Those monopolies enabled Microsoft to control the prices at which the OEM defendants had to buy operating system and application software for installation in the computers they manufactured. A rise in those prices would cut into the OEM defendants' profits since those defendants sell their goods in an extremely competitive market. Citing such cases as *Spectators' Communication Network v. Colonial Country Club*, 231 F.3d 1005 (5th Cir. 2000), plaintiffs counter that what may seem irrational in the abstract may not be

*Cf.* 3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 810 (1996) ("[I]n those instances where power is a prerequisite to holding an agreement to be an unreasonable restraint of trade [under section 1] ... it would make no sense to hold the same agreement offensive to § 2 without proof of power.").

so in fact, and that their allegations that the OEM defendants benefitted from their ready acquiescence to Microsoft's monopolistic demands make their charge of conspiracy plausible.[5]

The fallacy in plaintiffs' contention is that although plausibility is necessary for an antitrust conspiracy claim, it is not sufficient. *Cf.* 6 Phillip E. Areeda, *Antitrust Law* ¶ 1412g (1986). Plaintiffs have suggested motives that, at least in theory, might have led the OEM defendants to accept, willingly and voluntarily, the imposition of Microsoft's restrictive agreements. Plaintiffs have not, however, identified any facts to support their conclusory assertion that the OEM defendants acted with specific intent, i.e., that they decided that Microsoft's monopolies were in their own interest and something they affirmatively wanted to perpetuate. Based upon plaintiffs' allegations, it is at least as likely that the OEM defendants simply chose to make the best of a bad situation in order not to be undercut by their competitors.[6] In that regard, it is to be noted that plaintiffs allege that Microsoft imposed the same restrictive agreements upon all the OEMs with which it dealt. Thus, in accepting those restrictions, the OEM defendants are not alleged to have done anything different from any other OEM.

The only thing that plaintiffs contend distinguishes the OEM defendants from other OEMs is the alacrity with which they acquiesced in accepting those agreements to obtain relatively favorable prices from Microsoft for its products. But bargaining for better prices is perfectly normal commercial behavior, the type of behavior from which a court should be reluctant to infer conspiratorial conduct. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Zinser v. Rose*, 868 F.2d 938, 942 (7th Cir.1989). That is especially true since plaintiffs do not deny that the computer market in which the OEMs sell their products is fiercely competitive. *See Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 761 (7th Cir.1996) ("Computer manufacturers are vigorous rivals; . . . this is one of our economy's most competitive sectors."); *see also United States v. Microsoft Corp.*, 87 F.Supp.2d 30, 41 (D.D.C.2000) (noting the "very competitive PC market"); *United States v. Microsoft Corp.*, 84 F.Supp.2d 9, 24 at ¶ 54, 65 at ¶ 225 (D.D.C.1999) (same). No allegation is made that the OEM defendants, either individually or collectively, possessed sufficient market power to control the price of computers in any way. Therefore, if they did not negotiate for favorable prices with Microsoft, they ran the substantial risk of being undersold by their competitors.[7]

**5.** As indicated earlier in the text, plaintiffs allege that these benefits included relatively favorable prices for Microsoft products, greater cooperation from Microsoft in product development, the protection of market positions by ensuring that Windows-based offerings would not be undercut by rivals offering computer hardware with lower-priced software or without pre-installed software, and the ability to sell more computer hardware because Microsoft's operating system software requires greater hardware capacity. It would appear that only the first two categories of benefits were uniquely bestowed upon the OEM defendants in return for their alleged ready acquiescence.

**6.** Of course, the mere fact that a defendant is coerced into joining a conspiracy does not alone constitute a defense. *United States v.*

*Paramount Pictures, Inc.*, 334 U.S. 131, 161, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Spectators' Communication Network*, 231 F.3d at 1010–12 (listing cases). However, as I have stated, even willful and voluntary acceptance of restrictions imposed by a monopolist is not the equivalent of forming the specific intent to further the monopoly. It follows a fortiori that coerced acceptance of a monopolist's restriction does not constitute such intent. It is noteworthy that plaintiffs have expressly declined to take a position as to whether the OEM defendants were coerced into entering into Microsoft's restrictive agreements. (Gravity Pls.' Opp'n at 21–22.)

**7.** An apparent paradox of plaintiffs' claims is that, at least in the short run, the OEMs' ability to obtain cheaper prices for software

This leads to a related weakness in plaintiffs' claims against the OEM defendants. Although plaintiffs assert that those defendants were part of a single conspiracy to maintain Microsoft's monopolies, they make no allegation that the OEM defendants made any agreement among themselves. As alleged, this is a "spokes of the wheel" conspiracy with Microsoft at the hub but no rim discernible to the naked eye. The most that plaintiffs allege is that the OEM defendants acted in parallel, and consistently with the economic self-interest of each of them. This weakness would be fatal under the rule of *Mylan Laboratories, Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1066 (D.Md.1991), which held that a "rimless wheel" antitrust conspiracy is not actionable.

Assuming that the *Mylan Laboratories* rule is too rigid to the extent that it requires allegation and proof of an actual or virtual "conspiratorial meeting" among competitors, at the least plaintiffs "must demonstrate that the defendants shared a 'unity of purpose or a common design and understanding, or a meeting of the minds' to engage in the conduct prohibited by the Sherman Act." *Impro Prods. Inc. v. Herrick,* 715 F.2d 1267, 1273 (8th Cir.1983), *citing Am. Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Here, all that plaintiffs allege to meet this element is that the OEMs were generally aware that Microsoft was demanding similar restrictive agreements in all of their negotiations and that OEMs who acquiesced more quickly to Microsoft's demands were receiving more favorable terms. Again, this knowledge on the part of the OEMs would not establish that they "shared a unity of purpose" or that "their minds had met" to maintain Microsoft's monopolies. Likewise, the fact that, armed with that knowledge, the OEM defendants were each independently able to negotiate relatively favorable terms with

Microsoft establishes no "common design and understanding" between them. It shows nothing more than that they acted competitively vis-a-vis one another. To hold them liable for doing so would run afoul of the "fundamental antitrust concept that the alleged sins of sellers should not be visited on buyers because of the risk of chilling competition." *Genetic Sys. Corp. v. Abbott Labs.,* 691 F.Supp. 407, 415 (D.D.C.1988).

### III.

For these reasons, I find that plaintiffs have not stated any cognizable conspiracy claims. Therefore, I need not decide whether the co-conspirator exception to the *Illinois Brick* indirect purchaser rule adopted by many courts is properly applicable here. *Lowell v. Am. Cyanamid Co.,* 177 F.3d 1228, 1231 (11th Cir.1999); *In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 604–05 (7th Cir. 1997); *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 855 (3d Cir.1996); *Arizona v. Shamrock Foods Co.,* 729 F.2d 1208, 1211– 14 (9th Cir.1984); *Jewish Hosp. Ass'n v. Stewart Mech. Enters.,* 628 F.2d 971, 977 (6th Cir.1980); *In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1163 (5th Cir.1979); *In re Mid–Atlantic Toyota Antitrust Litig.,* 516 F.Supp. 1287, 1295 (D.Md.1981). Without the conspiracy theory, plaintiffs' class claims against Microsoft fail for the same reasons as do the federal claims of the plaintiffs in the other MDL actions that I dismiss today in *MDL Microsoft I.*

However, Gravity's individual claim against Microsoft for monopolization of case management and litigation support software survives Microsoft's perfunctory motion to dismiss. Determination of whether Gravity's "monopoly-leveraging" claim is viable must await development of a factual record. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 168–69 (4th Cir.1992) (en

from Microsoft presumably benefitted consumers, at least on price, since the OEMs

were selling in a highly competitive market.

banc); *Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 n. 17 (4th Cir.1990); *Advanced Health–Care Servs., Inc. v. Giles Mem'l Hosp.*, 846 F.Supp. 488, 496–97 (W.D.Va.1994) (ruling against the existence of a monopoly-leveraging claim under section 2 on summary judgment).

I will enter an order implementing the rulings made in this opinion after conferring with counsel.