MERICAN, INC. and Merican Curtis,
Inc. and Merican Curtis, Ltd.

v.

CATERPILLAR TRACTOR CO.

Caterpillar Tractor Co., Appellant.

No. 82–1577.

United States Court of Appeals,
Third Circuit.

Argued April 12, 1983.

Decided July 26, 1983.

John DeQ. Briggs, III (argued), David C. Murchison, William E. Wallace, III, Albert C. Loebe, Howrey & Simon, Washington, D.C., for appellant.

Robert G. Levy (argued), Berryl A. Speert, Allan P. Hillman, John M. Belferman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for appellees.

Before HUNTER, HIGGINBOTHAM, Circuit Judges and GERRY,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This interlocutory appeal requires us to address the limits imposed by *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), on liability for treble damages under section 4 of the Clayton Act, 15 U.S.C.A. § 15 (West Supp.1983). The issue arises in an action filed by plaintiff-appellees Merican, Inc., Merican Curtis, Inc., and Merican Curtis, Ltd. ("Appellees") against defendant-appellant Caterpillar Tractor Company ("Caterpillar"). Appellees allege that Caterpillar violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), by illegally imposing a penalty on its dealers in order to eliminate the source of supply of Caterpillar products to Appellees and other independent marketers. Following the district court's denial of Caterpillar's motion to dismiss, we granted appellate review under 28 U.S.C. § 1292(b) (1976) to address the question of whether Appellees are precluded from maintaining a private damage action by operation of the rule of *Illinois Brick.* We hold that the district court misconstrued the scope of *Illinois Brick* and its progeny and that it erred by refusing to grant Caterpillar's motion to dismiss Appellees' claims for damages.

### I

### A

This case involves the international sale and distribution of electric generator sets designed, manufactured, and marketed by Caterpillar.[1] To distribute its generator sets Caterpillar employs a world-wide network of authorized Caterpillar dealers who function generally as retail sellers of Cater-

pillar products. Each of those dealers enters into a Distribution Agreement with Caterpillar which provides for, *inter alia,* the promotion, distribution, installation, and servicing of Caterpillar-manufactured products by the dealers. Under that agreement each dealer has an area of service responsibility in which he agrees to maintain one or more suitable places of business, to maintain adequate service facilities, to employ trained salesmen to market Caterpillar's products, and to employ trained technicians and mechanics to render diagnostic and mechanical service to all users of Caterpillar products in the dealer's service area. In addition each dealer agrees to provide, free of charge to the user, delivery, inspection, and warranty services with respect to all Caterpillar products that receive their "initial substantial use" in that dealer's service territory, regardless of when, where, or by whom the product may have been sold.

Under the Distribution Agreement in effect in 1978, Caterpillar agreed to sell new generator sets to its dealers at a discount of 25% off the list price. Caterpillar allocated 5% of that discount as reasonable compensation for the dealer's obligation to assume the responsibility of providing delivery, inspection, and warranty services described above. If a dealer sold a generator set that received its initial substantial use in a second dealer's service territory, the selling dealer was not entitled to the 5% "service fee" and thus was only entitled to keep a 20% discount. Under the Distribution Agreement the selling dealer was required to return the 5% to Caterpillar, which in turn transferred it to the dealer responsible for providing service, if that dealer filed an appropriate claim. Caterpillar had a practice of returning the service fee to the selling dealer if the servicing dealer did not claim the fee within one year.[2] Thus if a

---

* Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation.

1. An electric generator set typically consists of a diesel engine, a generator, a battery, a governor, and transfer switches. It is used to provide "prime" power to buildings and clusters of buildings without access to central power sources and to provide "standby" power to hospitals, schools, or other buildings. Caterpil-

lar has sold a number of generator sets outside of the United States, specifically in the Middle East, for use in areas isolated from central sources of electrical power.

2. Prior to 1978 many dealers who sold generator sets receiving their initial substantial use in another dealer's service territory would simply transfer the 5% service fee directly to the servicing dealers. In July of 1978, Caterpillar began insisting that its dealers strictly comply

selling dealer sold a generator set for use outside his territory to an independent marketer who provided full warranty service, the selling dealer could adjust his price down knowing that another Caterpillar-authorized dealer would not have to provide service and accordingly would not claim the fee.

In 1978 Caterpillar instituted a new system for collecting the 5% service fee from its dealers. Under the new system Caterpillar no longer returned the service fee to a selling dealer when the servicing dealer made no claim for the fee. Instead the company retained all unclaimed service fees as miscellaneous income. The practical result of Caterpillar's new system was that its dealers could not provide as large a price reduction off the list price when they sold a generator set to an independent marketer for resale outside of the selling dealer's service area.

Appellees are general trading companies engaged in the international marketing and servicing of numerous products. In the mid-1970's Appellees began to trade in Caterpillar electric generator sets by purchasing them in the United States and then reselling them in the international market. Appellees purchased the sets primarily from Ohio Machinery Company ("OMCO"), a Caterpillar-authorized dealer located in Cleveland, Ohio. They would then resell them in competition with Caterpillar-authorized dealers in Europe and the Middle East, specifically Zahid Tractor and Heavy Machinery Company ("Zahid"), Caterpillar's authorized dealer in Saudi Arabia. Appellees or their reseller-customers performed the necessary delivery, installation, inspection, and warranty service for the users of the generator sets.

Appellees allege that Caterpillar changed its fee system in 1980 because of Appellees' competition in selling generator sets in Saudi Arabia. Appellees claim that the new system was the result of a combination and conspiracy between Caterpillar and Zahid "to allocate customers and territories for the sale of Caterpillar electric generator sets and to foreclose [Appellees] and other generator set marketers from engaging in price competition with defendant's authorized dealers." Complaint ¶ 21, app. at 18B.[3] Appellees allege that the service fee in effect became an "automatic penalty" imposed on dealers who sold generator sets for use outside their territory. They claim that because of Caterpillar's new policy, they have suffered substantial losses in sales and profits and have been restrained from securing new business. Appellees also allege that prices of electric generator sets have been artificially stabilized and maintained, that competition in the sale of the generator sets has been substantially lessened or eliminated, that Caterpillar's authorized dealers have been prevented from distributing generator sets in territories and to customers of their choosing, and that purchasers of the generator sets have been deprived of the opportunity to purchase those products from suppliers of their own choice at competitive prices.

## B

On September 25, 1980, Appellees filed this action in the United States District Court for the Eastern District of Pennsylvania. They filed an amended complaint on May 26, 1981. In their amended complaint Appellees claimed that Caterpillar's service fee system violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1976).[4] Appellees sought monetary and injunctive relief under sections 4 and 16 of the Clayton Act, 15

with the terms of the Distribution Agreement. Thus, as soon as a dealer knew that a generator set it was selling would receive its initial substantial use in another dealer's territory, he had to remit the 5% to Caterpillar, even if the servicing dealer had not yet claimed the fee.

3. Appellees allege that other unnamed corporations, firms, and individuals also participated as co-conspirators. Complaint at ¶ 9, app. at 9B.

4. Section 1 of the Sherman Act states in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1976).

U.S.C.A. § 15 (West Supp.1983); 15 U.S.C. § 26 (1976 & Supp. II 1978).

■ On March 1, 1982, Caterpillar filed a motion to dismiss[5] based on the rule of *Illinois Brick* that "indirect purchasers" are precluded from suing for passed-on damages under section 4 of the Clayton Act. *See Illinois Brick,* 431 U.S. at 746, 97 S.Ct. at 2074–75.[6] After hearing argument the district court issued an order from the bench on July 2, 1982, denying Caterpillar's motion. While recognizing Appellees' status as indirect purchasers, the district court held that based on the then-recent opinion of *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), it was improper "to just mechanically apply the *Illinois Brick* doctrine and thereby exclude in every case anybody who is not a direct purchaser from the original seller or the manufacturer." App. at 451I. Because the Appellees had alleged that they were the "direct target[s] of an unlawful conspiracy," the district court held that under *Illinois Brick,* as interpreted by *Blue Shield,* Appellees could maintain their action for damages. App. at 452I–53I. On August 16, 1982, the district court entered an amended order denying Caterpillar's motion to dismiss and certifying a controlling

question of law for immediate appeal pursuant to 28 U.S.C. § 1292(b) (1976).[7] We granted Caterpillar's petition for permission to file an interlocutory appeal on September 20, 1982.

## II

■ Section 4 of the Clayton Act provides a treble damage remedy to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C.A. § 15 (West Supp.1983). On its face section 4 is written very broadly. If read literally it is expansive enough to encompass any injury that could be attributed directly or indirectly to the consequences of an antitrust violation. The Supreme Court has held, however, "that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983) (quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972)). Rather section 4 claims must be considered in light of the statutory purposes behind the award-

---

5. In the same motion Caterpillar also sought summary judgment claiming that the district court was without jurisdiction to hear Appellees' claims. The district court denied that part of Caterpillar's motion holding that it had jurisdiction over Appellees' claims. App. at 452I–53I. We see no reason to disturb the district court's holding on that issue.

6. In its motion Caterpillar conceded that the rule of *Illinois Brick* would not bar Appellees from seeking injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26 (1976). App. at 102D; *see Mid-West Paper Prods. Co. v. Continental Group, Inc.,* 596 F.2d 573, 589–94 (3d Cir.1979).

7. The question certified by the district court reads:

When an alleged conspiracy between an electrical generator manufacturer and one of its authorized foreign dealers is formed to hinder and/or exclude intra-brand competition in the foreign market by an independent, non-factory authorized dealer who purchases from other authorized dealers for resale in the foreign market, whereby the manufactur-

er imposes a non-refundable "5% warranty service fee" on all sales by authorized dealers when the generators are to be installed for initial use outside of the authorized selling dealer's assigned geographical service territory, is the "target-victim" of the conspiracy (the independent non-factory authorized dealer) precluded from maintaining a private damage action against the manufacturer under Section 4 of the Clayton Act (15 U.S.C. § 15) by operation of the rule of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)?

App. at 457J–58J.

On a § 1292(b) appeal we consider all grounds which might require a reversal of the order appealed from. *Murphy v. Heppenstall Co.,* 635 F.2d 233, 235 n. 1 (3d Cir.1980), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982); *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 754 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); *Johnson v. Alldredge,* 488 F.2d 820, 822–23 (3d Cir.1973), *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974); *see* C. Wright & A. Miller, *Federal Practice and Procedure* § 3931 (1977 & Supp.1983).

ing of treble damages: to deter antitrust violators and deprive them of "the fruits of their illegality," and to compensate victims of antitrust violations for their injuries. *Pfizer Inc. v. Government of India,* 434 U.S. 308, 314, 98 S.Ct. 584, 588, 54 L.Ed.2d 563 (1978). In light of those statutory policies, the Supreme Court has recognized two types of limitations on the availability of the section 4 remedy which courts must consider when examining whether a treble damage action may be maintained. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 2545–46, 73 L.Ed.2d 149 (1982); *see In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 691 F.2d 1335, 1340 n. 6 (9th Cir.1982).

■ The first limitation on section 4 damage actions is drawn from *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), and *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). *Blue Shield,* 102 S.Ct.

at 2546. In *Hawaii v. Standard Oil* the Supreme Court held that section 4 did not authorize a state to sue in its *parens patriae* capacity for damages to its "general economy." 405 U.S. at 264, 92 S.Ct. at 892.[8] In *Illinois Brick* the Court held that indirect purchasers in a chain of distribution were precluded from bringing a damage action based on overcharges passed on to them by the direct purchasers of an antitrust violator. 431 U.S. at 746, 97 S.Ct. at 2074.[9] Those cases recognize that there are certain classes of plaintiffs who, although able to trace an injury to an antitrust violation, are generally not within the group of "private attorneys general" Congress created to enforce the antitrust laws under section 4. *Illinois Brick,* 431 U.S. at 746, 97 S.Ct. at 2074; *Hawaii v. Standard Oil,* 405 U.S. at 262, 92 S.Ct. at 891; *see Blue Shield,* 102 S.Ct. 2545–46. The Court in both *Hawaii v. Standard Oil* and *Illinois Brick* relied on two distinct policies to conclude that a section 4 claim was unavailable. First, it "focused on the risk of duplicative recovery

**8.** *Hawaii v. Standard Oil* was a suit by the State of Hawaii against several producers of petroleum. Hawaii alleged that the producers had entered illegal contracts, conspired to restrain trade, and attempted to monopolize the market. It sought damages in its proprietary capacity for overcharges to the State itself, as *parens patriae* for overcharges to the State's citizens, and as a class representative for all overcharged purchasers in Hawaii. 405 U.S. at 253, 92 S.Ct. at 886. The Court held that the injury asserted by Hawaii in its *parens patriae* capacity was not an injury to its "business or property" under § 4. 405 U.S. at 264, 92 S.Ct. at 892.

**9.** *Illinois Brick* was an action brought by the State of Illinois against manufacturers and distributors of concrete block in the Greater Chicago area. The concrete block manufacturers sold the blocks to masonry contractors who used them to build masonry structures; those structures were incorporated into entire buildings by general contractors, and the buildings were then sold to the State. The State claimed that the concrete block manufacturers had engaged in a combination and conspiracy to fix the prices of concrete block in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). *Illinois Brick,* 431 U.S. at 726–27, 97 S.Ct. at 2064–65. The Court held that the State, as an indirect purchaser of the concrete block, was not an "injured person" under § 4. *Id.* at 746, 97 S.Ct. at 2074.

The Court's opinion in *Illinois Brick* was "logically compelled" by its earlier decision in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). *Mid-West Paper Prods. Co. v. Continental Group, Inc.,* 596 F.2d 573, 576 (3d Cir.1979). In *Hanover Shoe* the Court held as a matter of law that an antitrust violator generally could not interpose a defense that a direct purchaser has not been injured because it had passed on an illegal overcharge to its own customers. 392 U.S. 494, 88 S.Ct. at 2232. *Illinois Brick* involved the offensive use of a pass-on theory by an indirect purchaser against an antitrust violator. Refusing to cut back on its holding in *Hanover Shoe,* the Court held that symmetry required barring the offensive use of pass-on by indirect purchasers in the distribution chain. *Id.* at 736; *see Mid-West Paper Products,* 596 F.2d at 576–77.

In *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 U.S. 2540, 73 L.Ed.2d 149 (1982), the Court recently reaffirmed the analysis in *Illinois Brick. Blue Shield* involved a suit by a Blue Shield subscriber who alleged that Blue Shield's policy of reimbursing subscribers for psychotherapy provided by psychiatrists, but not by psychologists, violated § 1 of the Sherman Act. The Court discussed the policies underlying *Illinois Brick* and held that, on the facts presented, the plaintiff was not barred from suit by operation of the *Illinois Brick* rule. 102 S.Ct. at 2546.

engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." *Blue Shield,* 102 S.Ct. at 2546. Second, it sought "to avoid burdening § 4 actions with damages issues giving rise to the need for 'massive evidence and complicated theories,' where the consequences would be to discourage vigorous enforcement of the antitrust laws by private suits." *Id.* at n. 11.[10] Applying those policies the Court concluded that it was inconsistent with the broader remedial purposes of the antitrust laws to allow the plaintiffs in either case to maintain a treble damage action.

■ The second limitation on section 4 damage actions identified by the Court is analytically distinct from the issue of what class of persons can sue for treble damages. It "is the conceptually more difficult question 'of which persons have sustained injuries *too remote* [from an antitrust violation]

to give them standing to sue for damages under § 4.' " *Blue Shield,* 102 S.Ct. at 2547 (emphasis in original) (quoting *Illinois Brick,* 431 U.S. at 728 n. 7, 97 S.Ct. 2065 n. 7). Through this concept of "antitrust standing," *see Associated General Contractors,* 103 S.Ct. at 907 n. 31,[11] the Court has engrafted on section 4 an analysis akin to "proximate cause" to determine whether a particular injury is too far removed from an alleged violation to warrant a section 4 remedy.[12] Because of the infinite variety of claims that arise under the antitrust statutes, however, it has refused to fashion a black-letter rule for determining standing in every case. *Associated General Contractors,* 103 S.Ct. at 907–08 & n. 33; *Blue Shield,* 102 S.Ct. at 2547 n. 12. Instead each situation must be analyzed on its facts in light of several factors: the causal connection between an antitrust violation and the injured party,[13] the nature of the plaintiff's alleged injury,[14] and the directness or indi-

**10.** The Court in *Blue Shield* denoted the problem of disentangling complex damage theories as a "subordinate theme." 102 S.Ct. at 2546 n. 11.

**11.** Included within the general perimeter of antitrust standing appears to be the idea of "antitrust injury" articulated by Justice Marshall in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). *See Associated Gen. Contractors,* 103 S.Ct. at 908–09; *Blue Shield,* 102 S.Ct. at 2550–51. *See generally* Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury,* 47 U.Chi.L.Rev. 467 (1980).

**12.** The courts of appeals have formulated a number of tests as aids in determining whether an injured party has sufficient standing under the antitrust laws to recover under § 4. Some courts focus on the "directness" of the injury, *e.g., Productive Inventions, Inc. v. Trico Prods. Corp.,* 224 F.2d 678 (2d Cir.1955), *cert. denied,* 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); *Volasco Prods. Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383 (6th Cir.1962), *cert. denied,* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); on its "foreseeability," *e.g., In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir.1973), *cert. denied,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974); *Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190 (9th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964); whether the injury "is arguably within the zone of interest protected by the antitrust laws," *e.g., Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142, 1152 (6th Cir.1975); or whether the injured party was

within the "target area" of the alleged antitrust conspiracy, *e.g., Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 449 U.S. 890, 100 S.Ct. 2964, 101 S.Ct. 248, 64 L.Ed. 839, 66 L.Ed.2d 116 (1980); *Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir.1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Application of those different tests, however, can lead to contradictory results. *See generally* Berger & Bernstein, *An Analytical Framework for Antitrust Standing,* 86 Yale L.J. 809, 835, 843 (1977); Handler, *The Shift From Substantive to Procedural Innovation in Antitrust Suits,* 71 Colum.L.Rev. 1, 27–31 (1971).

**13.** Claims that a defendant specifically intended to harm the plaintiff, however, are not of controlling significance. Although a defendant's improper motive may sometimes support a damages claim under § 4, it "is not a panacea that will enable any complaint to withstand a motion to dismiss." *Associated Gen. Contractors,* 103 S.Ct. at 908 & nn. 25, 26.

**14.** A claimed injury must be of the type that Congress sought to redress in providing a private damage remedy, and it must flow "from that which makes defendants' acts unlawful." *Blue Shield,* 102 S.Ct. at 2550 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701

rectness of the asserted injury.[15] *Associated General Contractors*, 103 S.Ct. at 907–13.[16] The Court's case-by-case approach reflects the fact that "§ 4 standing analysis is essentially a balancing test comprised of many constant and variable factors and that there is no talismanic test capable of resolving all § 4 standing problems." *Bravman v. Bassatt Furniture Industries*, 552 F.2d 90, 99 (3d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977) (standing determined by "factual matrix"); *see Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 581–82 (3d Cir.1979); *Cromar Co. v. Nuclear Materials and Equipment Corp.*, 543 F.2d 501, 508–09 (3d Cir.1976).

The two types of limitations on the section 4 remedy discussed above represent the judiciary's attempts to give shape to the statute's broad mandate in light of congressional intent and statutory policy.[17] They are not hard and fast rules that will dictate the result in every case. Rather they are principles "that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Associated General Contractors*,

103 S.Ct. at 908. Only by the careful application of those principles to the multitude of claims that potentially are swept within the scope of section 4 can courts properly effectuate Congress' antitrust policies of deterring antitrust violators and compensating victims of anticompetitive behavior.

## III

### A

In its motion to dismiss before the district court, Caterpillar urged that Appellees were indirect purchasers of Caterpillar's products and thus, under the rule of *Illinois Brick*, were not within the class of persons able to maintain a treble damage action under section 4. Specifically Caterpillar argued that Appellees claims were based on a pass-on theory—*i.e.* that Appellees suffered some form of economic injury only when and if an independent Caterpillar-authorized dealer made a decision to raise his prices in response to the smaller discount given on sales of generator sets to be used outside his service territory. Thus, Caterpillar argued that even assuming Appellees could prove that a "penalty" was passed on to them by OMCO,[18] as indirect purchasers of

(1979)); *see Associated Gen. Contractors*, 103 S.Ct. at 908–09.

**15.** Note that analyzing the directness or indirectness of the asserted injury for purposes of standing under § 4 implicates many of the same concerns identified in *Hawaii v. Standard Oil* and *Illinois Brick*. Those concerns include the existence of a separate class of persons whose self-interest will normally motivate them privately to enforce the antitrust laws through § 4, the speculative nature of damages resulting from indirect effects of antitrust violations, the potential for duplicative recovery, and the danger of complex apportionment of damages. *Associated Gen. Contractors*, 103 S.Ct. at 910–12; *see* Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.Rev. 979, 994–97 (1977). Thus in *Mid-West Paper Products* we traced the policies of *Illinois Brick* in determining whether a direct purchaser from an antitrust violator's competitors had standing to sue for treble damages allegedly resulting from those purchases. We held that under such an "umbrella" theory the direct purchasers of the defendant's competitor had no standing to sue. 596 F.2d 573, 580–87 & nn. 24, 25 (3d Cir.1979); *cf. In re Coordinated Pretrial Proceeding*, 691 F.2d at 1339–41 & n. 6 (*Illinois Brick* and not standing analysis applicable to action brought

by indirect purchaser under "umbrella" theory).

**16.** In *Blue Shield* the Court stated:

> In applying [the] elusive concept [of § 4 standing] to this [antitrust] action, we look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and, (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

102 S.Ct. at 2548.

**17.** While recognizing those two limitations, the Supreme Court was careful to state: "Consistent with the congressional purpose, we have refused to engraft artificial limitations on the § 4 remedy.... [I]n the absence of some articulable consideration of statutory policy suggesting a contrary conclusion in a particular factual setting, we have applied § 4 in accordance with its plain language and its broad remedial and deterrent objectives." *Blue Shield*, 102 S.Ct. at 2545 (footnote omitted).

**18.** For the purposes of the instant appeal we must assume that Appellees can prove the

Caterpillar's products, Appellees are barred from suing Caterpillar by *Illinois Brick.* App. at 88D–89D.

In denying Caterpillar's motion, however, the district court based its conclusion that *Illinois Brick* did not act as a bar to Appellees' suit on the analytically distinct issue of whether Appellees had "standing" to maintain an action for damages. The district court assumed that Appellees were the "direct targets" of an unlawful conspiracy and that, as a result of that conspiracy, they were forced out of business. It then concluded that "[i]f it is looked at from that light, ... clearly [Appellees] would be entitled to recover and would have standing to maintain an action for damages" under *Illinois Brick* and *Blue Shield.* App. at 452I.

■ We think that the district court misconstrued the inquiry to be conducted under the rule of *Illinois Brick.* The issue is not whether Appellees have sustained injuries too remote to give them standing or whether they are the direct targets of an alleged conspiracy, but rather whether they are in the class of persons considered to be injured in their business or property under section 4 by an antitrust violation. *Blue Shield,* 102 S.Ct. at 2546–47; *Illinois Brick,* 431 U.S. at 728 n. 7, 97 S.Ct. at 2065 n. 7. To make the latter inquiry, a district court must focus on the possibility of duplicative recovery and the potential for overly-complex damage claims if a damage suit is allowed. *Blue Shield,* 102 S.Ct. at 2546 & n. 11. Although those concerns were mentioned in oral argument at the hearing, *see* app. at 415I–16I, 443I, the district court did not explicitly address either of those two concerns when denying Caterpillar's motion, app. at 450I–53I. We hold that that omission was error. To consider properly the issue raised by Caterpillar's motion the inquiry must be whether, in light of the policies underlying *Illinois Brick,* are Appellees in the group of private attorneys general created by Congress to redress Caterpillar's

assumed antitrust violation through use of the treble damage remedy? [19]

### B

Appellees make two arguments why *Illinois Brick* is not a bar in the instant case. First they assert that it is simply inapplicable to the restraints alleged in their complaint. They argue that the rule of *Illinois Brick* is limited to the facts of that case—a claim of horizontal price fixing brought by indirect purchasers. In support of their very narrow reading of the rule's scope, Appellees seize upon language in *Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir.1979). *Mid-West Paper Products* was a suit brought by several groups of plaintiffs against manufacturers of consumer bags. In our opinion in that case, we observed that *Illinois Brick* allowed a direct purchaser to sue defendants who had fixed prices above the competitive market price because the benefit derived by the defendants was readily ascertainable. Thus a damage action "would [not] transform [that] antitrust litigation into the sort of complex economic proceeding that the *Illinois Brick* Court was desirous of avoiding if at all possible." 596 F.2d at 585 (footnote omitted). We went on to state in a footnote:

> A different problem is presented where prices are fixed below the competitive market price or where defendants engage in other forms of anticompetitive conduct, such as group boycotts, vertical restrictions, or monopolization, since defendants' benefits in those instances are not so readily ascertainable, and may not be sufficient to compensate "those individuals whose protection is the primary purpose of the antitrust laws." In such circumstances courts have awarded damages based upon the amount of injury suffered by the plaintiff rather than the benefits derived by the defendants.

*Id.* at n. 47. Appellees read footnote forty-seven as holding that claims of below-mar-

---

facts alleged in their amended complaint. *Associated Gen. Contractors,* 103 S.Ct. at 902.

**19.** We do not suggest that standing issues should have been ignored by the district court,

only that they limit the § 4 remedy in a different way. For the purposes of this appeal, Caterpillar has conceded that Appellees would have standing if their claims are not barred by *Illinois Brick.* Brief of Appellant at 5 n. 4.

ket price fixing, boycotts, vertical restrictions, and monopolization are *per se* outside the purview of *Illinois Brick*. Characterizing their claim as a challenge to Caterpillar's "effort to boycott and to eliminate plaintiffs' class of competitors from competing in the market . . . through the innovative mechanism of a vertically-imposed economic penalty," Brief of Appellees at 25, they conclude that this case is outside the rule of *Illinois Brick*.

We disagree. We do not read *Mid-West Paper Products* as holding that claims other than those of above-market horizontal price fixing are always outside the scope of *Illinois Brick*. Instead we read footnote forty-seven as observing that in certain situations the measure of damages for direct purchasers is based upon the injury suffered by the plaintiff, not the benefit obtained by the defendant. When defendants engage in below-market price fixing, group boycotts, vertical restraints, or monopolization, their benefits are sometimes not "readily ascertainable" and thus damages sought by proper plaintiffs must be measured by other means.

Our refusal to limit the rule of *Illinois Brick* solely to claims of certain horizontal price restraints is consistent with decisions in this and other courts. In *Edward J. Sweeny & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300

(1981), we held that under *Illinois Brick* indirect purchasers could not assert claims for damages under sections 1 and 2 of the Sherman Act. 637 F.2d at 122; *accord In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1157 (5th Cir.1979) ("Absent exceptional circumstances, *Illinois Brick* and *Hanover Shoe* limit the use of passing-on theory in antitrust actions without regard to the parties' characterization of the offense."), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980); *cf. Hanover Shoe*, 392 U.S. at 487, 88 S.Ct. at 2228 (monopolization case). In *Zinser v. Continental Grain Co.*, 660 F.2d 754, 760–61 (10th Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982), the court relied on *Illinois Brick* to bar indirect sellers from challenging a below-market price fixing scheme. In *Stein v. United Artists Corp.*, 691 F.2d 885, 895 (9th Cir.1982), the court applied *Illinois Brick* to bar a claim for damages based on an allegation that a defendant had illegally boycotted a corporation of which plaintiffs were creditors and guarantors. All of those cases recognize that the availability of the section 4 remedy depends not on the plaintiff's characterization of the illegal activity but on whether the problems identified in *Illinois Brick* would be avoided if relief were allowed. *See Blue Shield*, 102 S.Ct. at 2546 (Court examines underlying policies to determine whether *Illinois Brick* bars damage suit for alleged illegal boycott).[20] Thus the scope of

---

**20.** The cases relied on by Appellees, *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1246 (E.D.Pa.1980), and *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir.1980), are inapposite. In *Zenith* plaintiffs claimed that "virtually the entire Japanese consumer electronics product industry," had participated in a massive unitary conspiracy to flood the American market with inexpensive goods with the purpose of destroying the United States domestic consumer electronics product industry. Plaintiffs alleged violations of several statutes, including §§ 1 and 2 of the Sherman Act. The defendants moved to dismiss under *Illinois Brick*, claiming that Zenith could only prove it was injured by showing that the alleged injury directly inflicted on Zenith's distributors was passed on to Zenith through its distribution chain. In analyzing the motion the district court was careful to point out that Zenith's situation involved two manufacturers competing with each other and not, as in this case, the *Illinois Brick* situation of a seller-pur-

chaser relationship within a single chain of distribution. 494 F.Supp. at 1250, 1252–53, 1256. The court stated, "we perceive the principal teaching of *Mid-West* to be that the applicability of the *Illinois Brick* rule to fact patterns which diverge from the model of a single distribution chain should be determined by assessing, in each factual situation, the weight of the policies articulated by the Supreme Court in *Illinois Brick* and by the Third Circuit in *Mid-West.*" *Id.* at 1253. After examining the unique facts of that case in light of those policies, the district court denied the motion. We find *Zenith* completely consistent with our analysis that, in examining *Illinois Brick* problems, courts must evaluate each case in light of the policies underlying the rule.

Nor does *Royal Printing* offer support for Appellees' position. That case involved violations of § 1 of the Sherman Act alleged by several small retail businesses against ten of the nation's largest manufacturers of paper products. On a motion to dismiss under *Illi-*

*Illinois Brick's* rule barring treble damage actions by certain persons must be determined in each case by examining whether allowing those persons to sue could create the possibility of duplicative recovery and overly-complex damage claims.[21]

Appellees' second argument is that even examining their claims in light of the policy concerns of *Illinois Brick,* they should not be barred from seeking treble damages. Appellees do not contend that they fall within any of the recognized exceptions to the *Illinois Brick* rule.[22] Instead they rely on an affidavit executed by OMCO's president and offered by Caterpillar in support of its motion to dismiss. That affidavit states in pertinent part:

Neither the existence of the 5% [service fee] nor any changes in Caterpillar's administration thereof, including the 1978 or 1980 changes, has had any apparent effect on Ohio Machinery's incentive or

ability to sell Caterpillar electric generators sets outside its service territory generally or in Saudi Arabia specifically. App. at 110E. Appellees contend that OMCO's affidavit "denies absolutely that OMCO suffered any damage from Caterpillar's warranty fee system. OMCO has thereby vitiated any opportunity it might have had to sue successfully for damages as a result of the same purchases which are the subject of the present action." Brief of Appellees at 34. Appellees argue that the possibility of duplicative damages is thus avoided.

First, Appellees make no claim in their *complaint* that OMCO would not sue in the instant case. Appellees allege that Caterpillar and its co-conspirators have imposed an unlawful penalty upon OMCO which has prevented OMCO from distributing generator sets in territories and to customers of its own choosing. Without deciding the issue,

*nois Brick,* the court held that an indirect purchaser could sue for damages when it had made its purchases from a subsidiary or division of a co-conspirator, even if the pricing decision of such a subsidiary or division was determined by market forces. 621 F.2d at 326–27 & n. 4. The court went on to hold that purchases made through independent wholesalers, however, were barred. *Id.* at 327–28. The *Royal Printing* decision parallels the exception to *Illinois Brick* that we recognized in *In re Sugar Indus. Antitrust Litig.,* 579 F.2d 13 (3d Cir.1979). In that case we held that an antitrust violator cannot evade liability "by the simple expedient of inserting a subsidiary between the violator and the first uncontrolled purchaser." *Id.* at 19. While our view of the exception is somewhat narrower than that of the Ninth Circuit, *see Mid-West Paper Prods.,* 596 F.2d at 589 (violator must dominate subsidiary's prices in accordance with the general price fixing conspiracy), the exception in any form is inapplicable to this case. In its complaint Appellees admit that OMCO, the direct purchaser in this case, is not a subsidiary of Caterpillar but rather an independent dealer. Complaint at ¶¶ 8, 13; app. at 9B, 11B. Thus under either *Royal Printing* or *Mid-West Paper Prods.,* Appellees would be barred by the rule of *Illinois Brick.*

**21.** Another difficulty with Appellees' argument is their *post hoc* characterization of Caterpillar's activity as a "boycott." Appellees' complaint does not allege that anyone ever refused to sell them generator sets, only that the sets cost more because of the service fee imposed by Caterpillar on OMCO. The primary act they

challenge is the imposition of an unlawful penalty on Caterpillar's dealers, a claim very similar to the overcharges involved in *Illinois Brick.* Complaint ¶ 22, app. at 18B–19B; *cf. Jewish Hosp. Ass'n v. Stewart Mechanical Enters., Inc.,* 628 F.2d 971, 977 (6th Cir.1980) (court rejects belated attempt to recharacterize claim made in complaint so as to avoid *Illinois Brick*), *cert. denied,* 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981).

**22.** The Supreme Court noted two exceptions in *Illinois Brick.* Where there exists a fixed quantity, cost-plus contract between the direct purchaser and its customer or where the direct purchaser is owned or controlled by its customer the indirect purchaser would not be barred by the rule of *Illinois Brick.* 431 U.S. at 735–36 & n. 16, 97 S.Ct. at 2069–70 & n. 16. We relied on the latter in holding that in certain circumstances, an indirect purchaser could sue when it had purchased goods from the subsidiary of an antitrust violator. *Mid-West Paper Prods.,* 596 F.2d at 577 n. 8, 589; *In re Sugar Indus. Antitrust Litig.,* 579 F.2d at 18–19; *see* note 22 *supra.* Some lower courts have recognized a third "vertical-conspiracy exception" to *Illinois Brick. See, e.g., Fontana Aviation, Inc. v. Cessna Aircraft Co.,* 617 F.2d 478, 481 (7th Cir. 1980); *In re Mid-Atlantic Toyota Antitrust Litig.,* 516 F.Supp. 1287, 1294–96 (D.Md.1981). Because Appellees disavow any reliance on such an "exception," Brief of Appellees at 36 n. 26, we do not have to decide whether we would recognize its existence. *See In re Coordinated Pretrial Proceedings,* 691 F.2d at 1341 n. 9.

we note that it is possible that OMCO could make out a cause of action under the antitrust laws on those facts. *See Eiberger v. Sony Corp. of America,* 622 F.2d 1068 (2d Cir.1980). Second, it is not clear to us that OMCO's affidavit precludes it from suing Caterpillar. The fact that Caterpillar's service fee did not affect OMCO's ability to sell generator sets does not necessarily mean OMCO was not damaged by Caterpillar's policy. It could merely reflect that demand for the sets in Saudia Arabia was relatively inelastic with respect to price. OMCO could still claim that its profit margin was less due to imposition of the fee. Third, the Supreme Court recognized in *Illinois Brick* that it was possible that direct purchasers might not sue their suppliers in all cases. "But on balance ... we conclude that the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws under § 4 ... is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." 431 U.S. at 746, 97 S.Ct. at 2074. We do not know if, in fact, OMCO is going to sue Caterpillar. If it does, however, it would be claiming treble damages for injuries arising from the very same transactions involved in this case. Thus the risk of duplicative recovery is clearly present in this case, a danger the Court sought to avoid through application of the *Illinois Brick* rule.[23]

Appellees also contend that their damage claim does not present a problem of "massive evidence and complicated theories." *Illinois Brick,* 431 U.S. at 741, 97 S.Ct. at 2072

(quoting *Hanover Shoe,* 392 U.S. at 493, 88 S.Ct. at 2231). To prove any damages, however, Appellees would have to calculate the service fee on each generator set purchased by OMCO, determine how the imposition of the fee and market forces affected the price paid by Appellees,[24] and finally estimate how any increased price affected Appellees' profits and sales in light of competitive market forces in Saudi Arabia. That type of calculation was the very analysis the Supreme Court sought to avoid in *Illinois Brick,* 431 U.S. at 741–43, 97 S.Ct. at 2072–73. We recognize that damage analysis in antitrust actions is often difficult and complex. The instant case, however, presents damage issues which are sufficiently uncertain so as to impair the effectiveness of the section 4 remedy.

## IV

■ We hold that, based on facts alleged in their complaint, Appellees are barred from seeking treble damages under section 4 of the Clayton Act by operation of the rule of *Illinois Brick.* The possibility of duplicative recovery if the direct purchaser brings suit and the potential for complex apportionment of damages lead us to conclude that Appellees are not persons injured in their business or property by reason of a violation of the antitrust laws within the meaning of section 4. Our analysis is tempered by our recognition that the antitrust laws are written broadly to ensure rigorous enforcement of congressional policy. On the facts of this case, however, we find that the policies underlying *Illinois Brick* preclude Appellees from maintaining suit.

**23.** Before the district court Appellees suggested that the danger of duplicative recovery was not present in this case because they were suing not to recover the fee imposed by Caterpillar, but to recover the separate damages of Appellees' lost business and profits resulting from application of that fee to OMCO. App. at 438I–39I. Appellees admitted, however, that the issues were intertwined and that the damage calculation would concentrate on the increased amount OMCO had to pay for the sets. App. at 440I. Furthermore, by arguing that their damages are their lost profits *resulting* from Caterpillar's imposing the service fee on OMCO, Appellees implicate the second concern

of *Illinois Brick,* that of overly complex and speculative damage theories. *See also* app. at 414I–15I.

**24.** In the affidavit relied on by Appellees, OMCO's president stated:

In its dealings with Merican companies with respect to Caterpillar gensets and related products, Ohio Machinery negotiated with the Merican companies on an individual transaction by transaction basis. The price, delivery, and other terms varied from transaction to transaction, depending upon a myriad of considerations.

App. at 111E.

We will reverse the district court's order of July 2, 1982, as amended on August 16, 1982, and we will remand the case for further proceedings consistent with this opinion.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

I agree with the majority's conclusion that in focusing only on plaintiffs' standing to sue, the district court failed properly to determine whether, under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the potential for double recovery and excessive complexity bars plaintiffs from recovering treble damages under § 4 of the Clayton Act. I also agree that *Illinois Brick* cannot be mechanically applied so that an antitrust plaintiff's ability to recover turns upon the affixing of handy labels to the nature of the wrong alleged or to the plaintiff's position in the marketing hierarchy. The majority and I differ, however, on whether the policies underlying § 4 and *Illinois Brick* would be advanced by denying plaintiffs the opportunity to continue with this action. In my view, the prosecution of this suit would be both consistent with *Illinois Brick* and necessary to avoid immunizing the anti-competitive tactic that plaintiffs allege. Moreover, this court's discussion of the sweep of *Illinois Brick* in *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir.1979), supports my conclusion that plaintiffs' injuries are not of the kind contemplated by the *Illinois Brick* Court.

I begin with the Supreme Court's recent decision in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). There, in the course of determining that the plaintiff-patient had standing to sue the insurer selected by her employer, the Court demonstrated its reluctance to allow alleged anti-competitive conduct to go unchallenged merely for want of a direct relationship between plaintiff and defendant. In discussing *Illinois Brick*, the *Blue Shield* Court noted:

If there is a subordinate theme to our opinions in [*Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972)] and *Illinois Brick*, it is that the

feasibility and consequences of implementing particular damages theories may, in certain limited circumstances, be considered in determining who is entitled to prosecute an action brought under § 4. *Where consistent with the broader remedial purposes of the antitrust laws,* we have sought to avoid burdening § 4 actions with damages issues giving rise to the need for "massive evidence and complicated theories," *where the consequence would be to discourage vigorous enforcement* of the antitrust laws by private suits.

457 U.S. at 475 n. 11, 102 S.Ct. at 2546 n. 11 (quoting *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 493, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968)) (emphasis added). Thus, we should be mindful not only of the twin concerns behind the *Illinois Brick* rule, but also of the overarching policy favoring "compensating victims of antitrust violations for their injuries and deterring violators by depriving them threefold of 'the fruits of their illegality,' while at the same time furthering the overriding goal of the antitrust laws—preserving competition." *Mid-West Paper Products*, 596 F.2d at 583 (footnotes omitted).

*Illinois Brick* concerned horizontal price-fixing above market price; here, however, plaintiffs alleged the existence of a vertical price-fixing conspiracy. Although the majority correctly determines that mere nomenclature cannot magically obviate consideration of the *Illinois Brick* issue, the differences between the injuries alleged here and those contemplated in *Illinois Brick,* require us to ask whether the goals of avoiding duplicative recovery and excessive complexity would be advanced by barring this suit.

This court observed in *Mid-West Paper Products* that "when defendants have fixed prices above the competitive market price, where the benefit derived by them is readily ascertainable, the objectives of the treble damage action are fulfilled when the defendants are required to pay the direct purchasers three times the overcharge." *Id.* at 585 (footnote omitted). In the classic *Illinois Brick* circumstance, the price-fixer's

benefit is commensurate with the purchasers' injury. Thus, if both direct purchaser and indirect purchaser seek recovery of the amount of the overcharge, duplicative recovery is likely. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 494 F.Supp. 1246, 1255 (E.D.Pa.1980) (Becker, J.) (discussing *Mid-West Paper Products*). The same is not necessarily true, however, where the wrong alleged differs from the kind of anti-competitive act that was the focus of *Illinois Brick:*

> A different problem is presented where prices are fixed below the competitive market price or where defendants engage in other forms of anticompetitive conduct, such as group boycotts, vertical restrictions, or monopolization, since defendants' benefits in those instances are not so readily ascertainable, and may not be sufficient to compensate "those individuals whose protection is the primary purpose of the antitrust laws." In such circumstances courts have awarded damages based upon the amount of injury suffered by the plaintiff rather than the benefits derived by the defendants.

*Mid-West Paper Products,* 596 F.2d at 585 n. 47 (quoting *Cromar Co. v. Nuclear Materials and Equipment Corp.,* 543 F.2d 501, 505 (3d Cir.1976)). The majority, apparently focusing on the second quoted sentence, reads this discussion in *Mid-West Paper Products* as dealing only with the appropriate measure of damages. *See* majority opinion, at 968–969. I disagree. I think it is clear from the context of footnote 47 and from its emphasis on compensating the antitrust plaintiff that where an indirect purchaser has suffered injury other than incurring the cost of the passed-on overcharge, neither the policy of compensating injury nor that of deterring anti-competitive conduct can be realized unless the indirect purchaser can bring action against the seller. In the instant case, for example, plaintiffs alleged loss of sales and profits, reduction in the value of goodwill, and destruction of a significant portion of their businesses. Complaint at 14, *reprinted in* app. at 20B. Many of these alleged injuries are unique to the plaintiffs, and their complaint comprises more damage than the intermediary Ohio Machinery Company could recover were it to bring its own action. By putting treble damages outside of plaintiffs' reach, the majority effectively places complete recovery outside of anyone's reach. Under the majority's approach, plaintiffs cannot be made whole—notwithstanding the impossibility of duplicative recovery—and defendants cannot be made to give up the fruits of an alleged illegality.

Turning to the desire to avoid complexity, I consider it in its larger context. I do not read *Illinois Brick* to be concerned with protecting the courts from abstract economic theorizing so much as promoting vigorous policing of the marketplace. The *Illinois Brick* Court feared that tracing and allocating overcharges would seriously undermine the enforcement effectiveness of the treble damages action. 431 U.S. at 737, 745–47, 97 S.Ct. 2070, 2074–75. What I stated before in the context of antitrust standing bears equally on the issue now before us:

> The Court in *Illinois Brick* was concerned with allowing the injection of complex issues into antitrust actions because the injection of such complexity would increase the cost of litigation and thereby discourage the enforcement of the antitrust laws. . . .
>
> . . . Where added complexity does not result in a disincentive to the enforcement of the antitrust laws, its potency as an argument against standing is seriously diminished.

*Mid-West Paper Products,* 596 F.2d at 599 (Higginbotham, J., dissenting). Likewise, allowing the instant suit to go forward is necessary to the attainment of the goal of deterrence. The anti-competitive conduct plaintiffs complain of cannot otherwise be policed. This is not a case where passed-on overcharges are so splintered that no indirect purchaser will be interested in pursuing relief; here, plaintiffs allege predatory destruction of their business—a complaint which only they may bring.

Nor do I believe that *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 800 (1981), compels a different result. The abbreviated, one-paragraph discussion of the *Illinois Brick*

issue in that case includes no statement of rationale and no examination of the policies that underlie § 4 and *Illinois Brick*. To the extent that it can be read to bar relief to any plaintiff who falls into the category of "indirect purchaser," I do not believe that *Sweeney* survives the Supreme Court's decision in *Blue Shield*.

I would affirm the district court's denial of defendant's motion to dismiss.